UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
GOLDEN PRESIDENT SHIPPING CORPORATION,        :

                      Plaintiff,        :        08 Civ. _____

        - against -        :        ECF CASE

BOCIMAR NV,        :

                    Defendant.        :
--------------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, GOLDEN PRESIDENT SHIPPING CORPORATION (hereinafter "Plaintiff"),

by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint

against the Defendant, BOCIMAR NV (hereinafter "Defendant"), alleges, upon information and

belief, as follows:

1.       This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331.

2.       At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under foreign law.

3.       Upon information and belief, Defendant was, and still is, a foreign corporation, or

other business entity organized and existing under the laws of Belgium.

4.       By a charter party dated June 23, 1999, the Defendant chartered the vessel

"CHANNEL ALLIANCE" (hereinafter the "Vessel") from non-party, Straits Maritime

Corporation Limited.

5.     By a novation agreement entered into between Straits Maritime Corporation Limited and Plaintiff on or about July 22, 2004, the Plaintiff took over from and succeeded Straits Maritime Corporation Limited as the contractual counterparty to the Defendant under the charter party.

6.     Thus, at tall times relevant to the dispute, Plaintiff was the Owner of the Vessel.

7.     The charter party was for a five year period but the Defendant was granted the option to extend for two further one year periods.

8.     The charter party also included a profit sharing clause containing the sub-clause: "For profit sharing purposes, optional year(s), if declared to be considered on their own."

9.     Defendant exercised the option to extend into the sixth and seventh years but subsequently failed to pay the amounts due and owing to Plaintiff under the charter party in relation to the profit sharing clause for the sixth and seventh years.

10.    The Vessel was delivered into the service of the Defendant on September 10, 1999.

11.    The Vessel was redelivered to the Plaintiff on November 10, 2007.

12.    Disputes arose between the parties regarding Defendant's failure to pay the amounts due and owing to Plaintiff under the profit sharing clause of the charter party.

13.    As a result of Defendant's breach of the charter party, Plaintiff sustained damages in the total principal amount of $14,679,557.84, exclusive of interest, arbitration costs and attorneys fees.

14.    Pursuant to the charter party, all disputes arising thereunder were to be submitted to arbitration in London with English Law to apply.

15.    Thus, Plaintiff commenced arbitration in London against Defendant.

2

16.     On August 13, 2007, an Award was issued in Defendant's favor and against the
Plaintiff. See **Exhibit "1"** annexed hereto.

17.     Plaintiff appealed the arbitration award issued in Defendant's favor in the English
High Court of Justice. The facts of the appeal (and Plaintiff's underlying claim) are further set
forth in the Plaintiff's "Grounds of Application." See **Exhibit "2"** annexed hereto.

18.     A hearing was held and on January 31, 2008, and the English High Court of
Justice granted Plaintiff's appeal of the arbitration award and rendered a judgment in Plaintiff's
favor. See **Exhibit "3"** (Judgment) and **Exhibit "4"** (Order on Judgment) annexed hereto.

19.     Defendant applied for leave to appeal the judgment but the same was refused by
the English High Court of Justice.

20.     Defendant applied to the Court of Appeal for leave to appeal against the decision
of the English High Court of Justice refusing leave to appeal. The Court of Appeal has refused
this application, although Defendant is entitled to request the Court of Appeal to reconsider at an
oral hearing (such request to be made within 7 days of the date of service of the Court of
Appeal's order refusing leave to appeal).

21.     The Order on Judgment varies the arbitration Award and grants Plaintiff the
principal amount of $14,679,008.00 together with interest of $2,250,111.53 as of the date of
judgment, i.e. January 31, 2008, increasing thereafter at $2,996.32 per day until payment. The
Order further grants Plaintiff the costs of the appeal, and remands the decision on who should
bear the costs of the arbitration to the arbitrators.

22.     The Judgment further provides that if the parties cannot agree on the interest
owed or other ancillary matters including the costs of the arbitration and award, a further
Judgment will be issued providing for such.

23. Plaintiff's costs with regards to the appeal and the arbitration award are approximately $200,000.00.

24. Unless liability for and the quantum of costs can be agreed with Defendant, Plaintiff will apply to the English High Court of Justice to assess the costs of the appeal, and to apply to the arbitrators for an award on liability for the costs of the arbitration, and for an assessment of those costs thereafter.

25. Plaintiff requests security herein for the Award as varied by the English High Court of Justice's January 31, 2008 Judgment, and for the eventual judgment and award on costs, both of which it intends to enforce as Judgments of this Court.

26. As best as can now be estimated, Plaintiff expects to recover the following amounts pursuant to the Judgments which have been or will be issued by the English High Court of Justice and the London arbitrators:

|   |   |   |
|---|---|---|
| A. | Principal claim: | $14,679,557.84 |
| B. | Interest to January 31, 2008: | $2,250,111.53 |
| C. | Further interest to the date hereof, April 9, 2008: | $ 206,746.08 |
| D. | Further interest from the date hereof until payment 365 days at $2,996.32 per day as per the award as varied by the English High Court: | $1,093,656.80 |
| E. | Estimated recoverable legal fees and costs: | $ 200,000.00 |
| **Total:** | | **$18,430,072.25** |

27. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

4

held in the hands of one or more garnishees which are believed to be due and owing to the
Defendant.

28.     The Plaintiff seeks an order from this court directing the Clerk of Court to
issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental
Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any proeprty of the
Defendant held by any garnishee within the District for the purpose of obtaining personal
jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear
and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court
recognize and confirm any foreign judgment or arbitration award rendered on the claims had
herein as a Judgment of this Court;

C.     That since the Defendant cannot be found within this District pursuant to
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue
an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment
pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims,
attaching all tangible or intangible property of the Defendant within the District, including but
not limited to any funds held by any garnishee, which are due and owing to the Defendant, up to
the amount **$18,430,072.25** to secure the Plaintiff's claims, and that all persons claiming any
interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer
the matters alleged in the Complaint;

D.     That this Court enter Judgment against Defendant on the claims set forth herein;

E.     That this Court retain jurisdiction over this matter through the entry of any

5

judgment or award associated with any of the claims currently pending, or which may be
initiated in the future, including any appeals thereof;

      F.     That this Court award Plaintiff its attorney's fees and costs of this action; and

      G.    That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: April 10, 2008
      New York, NY

             The Plaintiff,
             GOLDEN PRESIDENT SHIPPING CORPORATION

             By:
             Nancy R. Peterson
             Patrick F. Lennon
             LENNON, MURPHY & LENNON, LLC
             420 Lexington Ave., Suite 300
             New York, NY 10170
             (212) 490-6050 – phone
             (212) 490-6070 – fax
             nrp@lenmur.com
             pfl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York   )
                    )        ss.:    New York City
County of New York  )

1.    My name is Patrick F. Lennon.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        April 10, 2008
              New York, NY

                                            Patrick F. Lennon.

7

# Exhibit 1

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

B E T W E E N :-

GOLDEN PRESIDENT SHIPPING CORPORATION

Claimants
(Owners)

- and -

BOCIMAR NV

Respondents
(Time Charterers)

"CHANNEL ALLIANCE"

Charterparty dated 23 June 1999

FINAL ARBITRATION AWARD

W H E R E A S :-

1.    By a charterparty on an amended NYPE form, dated Antwerp 23 June 1999 the
      respondents (hereinafter referred to as "the Charterers") chartered the "CHANNEL

48

25

- 2 -

ALLIANCE" from Straits Maritime Corporation Limited. By a novation agreement entered into between Straits Maritime Corporation Limited and the claimants (hereinafter referred to as "the Owners") on or about 22 July 2004, the Owners took over from and succeeded Straits Maritime Corporation Limited as the contractual counterparty to the Charterers under the charterparty. The Owners subsequently assigned the right to receive the sums payable by the Charterers pursuant to the charterparty to Scotiabank Europe plc. However, the said right has been reassigned to the Owners and notice thereof given to the Charterers.

2.    The said charterparty provided, inter alia, that should any disputes arise, between the parties, they were to be referred to arbitration in London, each party appointing an arbitrator and a third being appointed by the two so chosen.

3.    Disputes arose between the parties as detailed hereafter. The Owners appointed me, William Robertson of The Atlas Room, 37 Woodpecker Crescent, Burgess Hill, West Sussex, RH15 9XY, as the arbitrator nominated by them. The Charterers appointed me, Mark Hamsher of 18c Ensign Street, London, E1 8JD, as the arbitrator nominated by them. We, the said arbitrators, in turn appointed the undersigned Timothy Rayment of 47 Castelnau, London, SW13, 9RT as the third arbitrator. The seat of the arbitration is in London.

49                                                                              26

- 3 -

4.    The Owners claimed US$14,865,008 as their share of the profits under a profit sharing agreement in the charterparty. Without prejudice to their right to pursue the balance of their claim at a future date, they applied for a partial award in the amount of US$14,679,557.84 together with interest and costs. The Charterers denied liability for the claim.

5.    The arbitration was heard on 30 and 31 July 2007 at the offices of Messrs M J Kusel & Co, The Courtyard, 124 Aldersgate Street, London, EC1A 4JQ. The parties were represented by their solicitors and counsel and both parties called one witness. Both parties requested us to make a reasoned award and our reasons are hereby attached to and form part of this our final arbitration award.

6.    NOW WE the said William Robertson, Mark Hamsher and Timothy Rayment, having taken upon ourselves the burden of this reference, having carefully and conscientiously considered the written and oral evidence adduced before us and listened to the arguments of counsel for the parties DO HEREBY MAKE ISSUE AND PUBLISH this our UNANIMOUS FINAL AWARD as follows:-

A)    WE FIND that the Owners' claim fails and is hereby dismissed.

27

- 4 -

B)    WE THEREFORE AWARD AND ADJUDGE that nothing is payable by the
Charterers to the Owners in respect of the claim referred to us.

C)    WE FURTHER AWARD AND ADJUDGE that the Owners shall bear their own and
the Charterers' costs of the reference, the latter, if not agreed, to be assessed in the
option of the Charterers either by the English High Court of Justice or by us in an
award of costs, we hereby reserving our jurisdiction as necessary.

D)    WE FURTHER AWARD AND ADJUDGE that the Owners shall bear the costs of
this our final award in the amount of £25,675 PROVIDED THAT if, in the first
instance, the Charterers shall have borne any part of the said costs of this our final
award they shall be entitled to immediate reimbursement by the Owners of the sum so
paid.

E)    WE FURTHER AWARD AND ADJUDGE that the Charterers shall be entitled to
compound interest on any sums payable to them under paragraphs C and D above at
the rate of 7.75% per annum compounded at three monthly rests from the date of this
award until the date of payment or reimbursement as appropriate.

28

- 5 -

GIVEN under our hands in London this    13th,    day of August 2007

William Robertson

Witness

Mark Hamsher

Witness

Timothy Rayment

Witness

## "CHANNEL ALLIANCE"

### Charterparty dated 23 June 1999

## REASONS FOR AND FORMING PART OF THE
## FINAL ARBITRATION AWARD

1.  This arbitration concerned a claim by the Owners under a long term time charterparty
    for a share of the profits under a profit sharing clause in the charterparty. The
    charterparty period was one for five years but the Charterers were given the option to
    extend the charterparty for two further one year periods. It was common ground that
    the profit sharing agreement applied for the first five years. It was the Owners' case
    that it also applied during the two optional additional years, in respect of which the
    Charterers had exercised their option. It was the Charterers' case that the profit
    sharing agreement did not apply during the optional additional years.

2.  In these reasons, we have referred simply to the Owners. In reality, they were the
    owners by novation. The Charterers however accepted that they were entitled to
    pursue their claim under the charterparty.

3.  The "CHANNEL ALLIANCE" is a 1996 built capesize bulk carrier with a summer
    deadweight of 171,978 metric tons on a draught of 17.730 metres.

4.  She was fixed by the predecessors of the claimant Owners (both of whom are/were
    part of the Golden Ocean Group of companies) on an amended NYPE form

53                                    30

-2- ·

charterparty dated 23 June 1999 to the Charterers, who are the substantial owners and

operators of dry bulk tonnage, Bocimar NV of Antwerp. Line 14 of the charterparty

which contained a space for the insertion of the period of the charterparty, contained a

reference to additional clause 35 which read:-

"PERIOD

Five (5) years two (2) months more or less in Charterer's option
timecharter.

Charterer's option declarable latest at the end of the 54th month for an
additional 6th year timecharter.

Charterer's option declarable latest at the end of the 66th month for an
additional 7th year timecharter.

The 2 months more or less in Charterer's option to apply only on the
final period."

Clause 4 of the charterparty provided that the daily hire rate was US$13,750 per day
or pro rata including overtime, net of commission.

Additional clause 58 provided:-

31

- 3 -

## "OFF-HIRE EXTENSION

Charterers have the option to add off-hire period, if any, and option to be declared 30 days before redelivery."

Additional clause 98 contained a number of separate, unnumbered paragraphs. However, for ease of identification, we shall number the paragraphs in the same way that the parties did for the hearing. The clause provided:-

## "PROFITSHARING

1) Charterers and Owners agree that over the basic charter period of 5 years both Owners and Charterers will share the profit made on a 50/50 basis on the running of the vessel as compared to the floor rate of charter hire i.e. USD13,750/day. The profit made will be calculated by comparing the floor rate of USD13,750/day with the average rate reflected in the Baltic Cape Size Index (daily average of the routes 8-9-10-11 as published by the Baltic Capesize Index to be adjusted upwards by usd 975 per day or prorata to reflect the value of the MS Channel Alliance compared with the 'index' vessel) during any year of the basic charter period.

2) Should during the currency of the Charter the Baltic Cape Size Index cease to exist as a means of comparison or should the

55

32

- 4 -

parameters of the Index which existed at the time of conclusion of the Charter be amended, parties will agree a new reference rate. If parties cannot agree on such reference rate, in order to determine same parties will appoint a reputable London broker by mutual consent, or, if parties cannot agree on such broker each party will appoint their own broker who will both appoint a third broker should the two appointed fail to agree. The decision of the appointed broker or brokers will be binding.

3)  At time of fixing the Baltic Capesize Index (B.C.I.) is described as follows :

"Timecharter routes : based on a Baltic Capesize of the following specification : 161.000 mt dwt, not over 10 years of age, 176.000 cbm grain, max. loa 280 m, max. beam 45 m, 14 knots laden, 14,5 knots ballast on 52 mts fuel oil, no diesel at sea.

- Route 8 : Delivery Gibraltar-Hamburg range, 5-15 days ahead of the index date, trans Atlantic round voyage duration 30-45 days, redelivery Gibraltar-Hamburg range, 3.75 per cent total commission

- Route 9 : Delivery ARA or passing Passero, 5-15 days ahead of the index date, redelivery China-Japan range, duration about 65 days, 3.75 per cent total commission

56

33

- 5 -

- Route 10 : Delivery China-Japan range, 5-15 days ahead of the index date, round voyage 30-40 days, redelivery China-Japan range, 3.75 per cent total commission

- Route 11 : Delivery China-Japan range, 5-15 days ahead of the index date, redelivery ARA or passing Passero, duration about 65 days, 3.75 per cent total commission"

4)    At the end of each year of the basic charter period the profit or loss for that year will be assessed by comparing the average Baltic Capesize Index rate for that year (adjusted accordingly) with the basic charter rate over the number of days that the vessel has been in service excluding days of off-hire.

5)    If a profit has been made in any particular year an advance in respect of Owners' share will be made by Charterers to Owners at the end of that year provided however that if losses have been made in the previous year(s) which are greater than the profit made no advance will be made. If during the currency of any year Charterers anticipate that there will be an overall loss taking into account the previous year(s) Charterers will be entitled to make deductions from hire to up to the total amount of profit already advanced to Owners during the preceding years to cover such loss.

34

- 6 -

6)     For profit sharing purposes, optional year(s), if declared to be
       considered on their own.

7)     Example profit sharing

       - year 1 : loss USD 300.00

       no distribution/no reduction

       - year 2 : profit USD 100.000 -

       no distribution/no reduction

       - year 3 : profit USD 400.000 -

       distribution of USD 100.00 to GO

       (i.e. 50% of USD 400.00 – (USD 300.00-USD 100.000)

       - year 4 : profit USD 500.000

       distribution of USD 250.000 to GO

       - year 5 : loss USD 400.000

       Charterers can deduct USD200.000 from the hire (upto

       maximum the advances)".

5.     The vessel was delivered into the service of the Charterers on 10 September 1999.
       The Charterers exercised their options for the two additional years and subsequently
       for the two additional months. The vessel was redelivered to the Owners on 10
       November 2006.

6.     It was common ground between the parties that for the first five years of the
       charterparty, the Owners' profit share under additional clause 98 had been as
       follows:-

-7-

    (a)    10.9.99 to 9.9.00:

        Gross profit:        US$ 2,131,594

        Owners' share:      US$1,065,797

    (b)    10.9.00 to 9.9.01:

        Gross profit:        US$ 1,808,730

        Owners' share:      US$ 904,365

    (c)    10.9.01 to 9.9.02:

        Gross loss:        [US$ 1,321,882]

        Owners' share:      [US$ 660,941]

    (d)    10.9.02 to 9.9.03:

        Gross profit:        US$ 4,281,962

        Owners' share:      US$ 2,140,981

    (e)    10.9.03 to 9.9.04:

        Gross profit:        US$ 19,154,906

        Owners' share:      US$ 9,577,453

7.    The Owners calculated their 50% share of the profits for the additional two years and two months as follows:-

    (a)    2004/2005

        Gross profit:        US$17,049,464.98

        Owners' 50% share:    US$8,524,732.49

36

(b)    2005/2006

    Gross profit:    US$9,352,004.04

    Owners' 50% share:    US$4,676,002.02

(c)    Marginal period

    (9/06 – 11/06)

    Gross profit:    US$3,328,546.13

    Owners' share:    US$1,964,273.06

Total Owners' profit share:    US$14,865,008.00

8.    The Charterers calculated that if, contrary to their case, the profit sharing agreement did apply to the additional periods, taking into account off hire periods, the Owners' entitlement would be US$14,679,557.84.

9.    Without prejudice to their right to pursue the balance of their claim at a future date if any differences could not be resolved amicably, the Owners applied for a partial award in the amount of US$14,679,557.84 together with interest and costs.

10.    The Owners claimed that, on proper construction of additional clause 98, the profit sharing agreement applied to each optional additional year. Each optional additional year was to stand on its own, without the application of the provisions for adjustments to take account of losses which were also contained in additional clause 98 but which, they argued, applied only to the first five years of the charterparty service. If that was not the effect of a proper construction of additional clause 98 then they applied for

37

- 9 -

rectification of additional clause 98 to make it clear that there should be profit sharing during the optional years.

11.   The Charterers denied liability for the Owners' claims. They argued that, properly construed, additional clause 98 did not bear the meaning argued for by the Owners and they denied that the Owners were able to satisfy the requirements to establish an entitlement to rectification. They formally counterclaimed a declaration that they were under no liability to the Owners.

12.   The size of the Owners' claims is attributable to the unprecedented boom in the freight markets that occurred from mid 2004 onwards. Although the market dipped in 2005, throughout the optional years it was generally sustained not only at historically high levels but for an unprecedented length of time. These high freight rates added colour to the arguments advanced on behalf of the Owners that the Charterers' construction of additional clause 98 enabled the Charterers to make a profit at the expense of the Owners but, very correctly, it was not suggested that the size of the profits in question had any bearing on the issues that we had to determine.

13.   It was common ground between the parties that the Owners' primary claim turned on the issue of the proper construction of additional clause 98. Both parties were agreed that, taking into account the decision in *ICS -v- West Bromwich B.S.*, the meaning of the charterparty was to be ascertained objectively by reference to "the meaning which the documents would convey to a reasonable person having all the knowledge which would reasonably have been available to the parties in this situation in which they

61

- 10 -

were at the time of the contract." There were, however, differences between the parties as to what background facts were properly to be taken into account.

14.  It was also common ground between the parties that the history of the negotiations leading up to the final, signed charterparty was not a legitimate aid to construction of the charterparty. However, the history of the negotiations was relevant to the alternative claim for rectification. With regard to the background to the charterparty and the history of the negotiations, we had the benefit of hearing evidence from Mr Darragh Waterkeyn, who negotiated the charterparty on behalf of the then owners. We also heard evidence from Mr Benoit Timmermans. At the time he was (and indeed still is) the managing director of the Charterers. The actual negotiations with the Owners were carried out by a subordinate chartering broker, Mr Phillippe Waterkeyn (apparently a distant relative of Mr Darragh Waterkeyn!). Unfortunately Mr Phillippe Waterkeyn had had to leave the Charterers because of ill health and he was too unwell to give evidence. However Mr Benoit Timmermans was able to give evidence about the history and negotiation of the charterparty because, as managing director, he sits at the chartering desk and the negotiation of the charterparty had taken place under his supervision and the negotiating positions adopted by the Charterers and the final contract were approved by him.

15.  Clause 98 was a complicated clause because the intention of the parties was to alter the consequence of a blanket 50/50 profit sharing agreement by providing for losses in one year to be set off against profits in other years, but on the basis that the adjustments for losses should never reduce the actual hire being received by the Owners. The agreement for adjustments that was set out in paragraphs 5 and 7 of

62                                                                39

- 11 -

additional clause 98 was referred to both by the parties and at the hearing as the "balancing" or "netting off" arrangement.

16.    It was appropriate to consider first the meaning of additional clause 98 in the context of the charterparty as a whole solely on the basis of the words agreed by the parties before considering whether there were any circumstances that had a bearing on the meaning of the words.

17.    The Owners relied heavily on paragraph 6 of additional clause 98. They argued that if the Charterers' interpretation of additional clause 98 was correct, there would be no need for paragraph 6 to have been inserted into the clause at all. They argued that the paragraph could not be sensibly construed as meaning that there would be no profit sharing for the optional year or years; it merely recorded that the "netting off" provisions would not be applicable to the optional years.

18.    It was their case that the structure of additional clause 98 was perfectly logical. Paragraph 1 introduced the concept of profit sharing. Paragraph 2 dealt with what would happen if the Baltic Capesize Index was amended or discontinued "during the currency of the Charter". Paragraph 3 set out the published bases for the calculation of the Baltic Capesize Index ("BCI") and the four Capesize routes to enable a substitute to be designed in the event that they were amended or discontinued. Paragraph 4 explained when and how the profit was to be calculated. Paragraph 5 contained the provisions for netting off profits against earlier losses. Paragraph 6, according to the Owners, merely recorded that the netting off provisions of the preceding paragraph would not apply to the optional year/years. Finally, paragraph 7

- 12 -

showed how netting off would work on hypothetical facts simply to make the working of the scheme clear over a five year period.

19.    The Charterers emphasised that clause 98 contained the sole source of the obligation on the Charterers to share profits with the Owners. They emphasised that paragraph 1 contained the key obligation to share profits "over the basic charter period of 5 years". They pointed out that paragraph 4 was consistent with paragraph 1 because it provided that the profit or loss for each year was assessed "at the end of each year of the basic charter period". They argued that the example of profit sharing contained in paragraph 7 was consistent with the restriction of profit sharing to the basic charter period of five years because it only gave examples of how this scheme would operate during only the first five years of the charterparty.

20.    The Charterers argued that the effect of paragraph 6 was to exclude profit sharing entirely from the optional additional years. They argued that the clause made it clear that the parties were drawing a distinction between the optional years (which were to be "considered on their own") and, by inference, the only other possible relevant years, namely the basic five years of the charterparty.  They pointed out that paragraph 6 made no reference to "profit made" in the two optional additional years. They accepted that (as is almost always the case on issues of construction!) the clause could have been more clearly worded. However, they argued that read in the context of the whole of additional clause 98 its clear effect was not to exempt the optional additional years merely from the "netting off" provisions of the clause but entirely from the profit sharing arrangements governing the basic charterparty period of five years.

64

41

- 13 -

21.    Although it was a self-evident point, we agreed with the Charterers that it was
relevant to bear in mind that, but for additional clause 98, there would be no
obligation to share profits; a time charterer bears the commercial risk of market rates
differing from the long term time charterparty rates and if they are favourable then the
time charterer normally retains all the profits. In other words, the periods to which
the profit sharing agreement applied had to be clear. Paragraph 1 specified that the
profit sharing agreement was to apply "over the basic charter period of 5 years" and
the calculation of any relevant profits was to be made "during any year of the basic
charter period".

22.    The Owners sought to attach importance to the fact that in paragraph 2 the parties
agreed what should happen if the Index should cease to exist or its parameters be
changed, "during the currency of the Charter". The expression was broad enough to
cover any additional periods over and above the basic five year period of the time
charterparty. However, the phrase was used in a clause making provision for a
technical eventuality that might occur; it was part of the agreed mechanics of
calculating the profit. We did not consider that one could derive from those words in
that paragraph an objective intention, simply based on the wording of that clause, to
alter the very clear and explicit provision in paragraph 1 (which set out the essential
principles of the profit sharing agreement) that the profit share should apply during
"the basic charter period of 5 years".

23.    Paragraph 4 again made it clear that the profit or loss calculation was to be carried out
"at the end of each year of the basic charter period".

42

- 14 -

24.    Paragraph 5 set out the agreed arrangement for "balancing" or "netting off" profits
against losses; the references to "any particular year" and "in the previous year(s)"
were general expressions that were consistent with both parties' cases.

25.    The meaning of paragraph 6 was not obvious. It was a clause that was inserted at the
request of Mr Phillippe Waterkeyn of the Charterers, whose first language is not
English. As we have already mentioned, the Owners argued that, if the Charterers'
construction of additional clause 98 was correct, there would be no need for paragraph
6. The Charterers' response was that it was intended to emphasise the fact that the
profit sharing arrangements were not to apply to the optional additional years. The
Charterers relied on the principle that, in general, in commercial contracts there is no
presumption against surplusage. The Owners countered by arguing that the paragraph
was phrased in a positive rather than in a prohibitive way. They also argued that the
word "considered" carried with it an inference of being the object of some treatment
rather than falling right outside the profit sharing scheme.

26.    As has already been mentioned, the Owners countered the Charterers' argument that
paragraph 7 made no reference to the optional additional years by emphasising that,
on their construction of additional clause 98, the balancing or netting off provisions
did not apply to the optional additional years; by definition, they argued, there was no
need to include them. However, we thought that the Owners' argument was seriously
weakened by the fact that the heading of paragraph 7 was not something like
"Example balancing" or "Example netting off losses against profits" but simply
"Example profit sharing". If the additional clause 98 did properly record the

43

- 15 -

agreement of the parties that profit sharing was to extend to the optional additional years, then we would have expected hypothetical sums to be shown for optional additional years six and seven with a distribution if there was a profit but no reduction to take account of losses in any other years.

27.   Although the points of claim served on behalf of the Owners made out the best possible case for the Owners' construction and the different counsel who argued the case at the hearing was very eloquent, we had little hesitation in concluding that, as part of additional clause 98, paragraph 6, even with such support as could be derived from paragraph 2, was insufficiently clear to alter the express provision in paragraph 1 which clearly and unambiguously restricted the profit sharing agreement to "the basic charter period of 5 years". That conclusion was not weakened by the Owners' argument that paragraph 6 should be construed against the Charterers who had proposed its insertion into the charterparty. In the context of the whole clause, its meaning was clear.

28.   We were supported in that conclusion by two further considerations. Firstly, if the parties had intended the profit sharing agreement to extend to the sixth and seventh optional additional years one would have expected a clear agreement as to how and when any profit was to be calculated and shared. However, as has already been emphasised, paragraphs 1 and 4 which covered those essential points referred expressly only to "the basic charter period of 5 years" and "at the end of each year of the basic charter period". No doubt one could argue that a term should be implied to the effect that the profit in the additional optional years should be shared at the end of the years in question. However, given the detail of the arrangements contained in

- 16 -

additional clause 98, it would be surprising if one had to resort to an implied term to determine the specific intention of the parties in respect of something that would have been an important part of the overall agreement between them.

29.  Secondly, although the wording of clause 35 was rather unusual and one should not read too much into it, its wording was certainly consistent with our conclusion. In that clause, the parties recorded when the Charterers had to declare their options for the optional additional years. They were not, however, described as "extensions" to the agreed time charter period (which would support an argument that the same terms and conditions should apply) but the clause referred to the options "for an additional 6th year timecharter" and "for an additional 7th year timecharter". Those expressions were consistent with an understanding that the profit sharing agreement which was expressly set to apply to the "the basic charter period of 5 years" was not to be carried over into the optional additional sixth and seventh years.

30.  It was appropriate to test our conclusion as to the meaning of the words themselves against the commercial background to the transaction to see whether there were circumstances either relating to the general commercial background of such charterparties or to the parties that cast doubt on our construction of the clause. We had in mind the comments of Lord Mustill in the "GREGOS" in which he said:-

> "Turning to the practicalities, I entirely share the opinion of Saville J. (in *The Peonia* [1991] 1 Lloyd's Rep. 100, 102) that questions of this kind are better decided by looking at what the contract says than by speculating on the practical outcome of preferring one solution to

45

- 17 -

> another.   Naturally, no judge will favour an interpretation which
> produces an obviously absurd result unless the words used drive him to
> it, since it is unlikely that this is what the parties intended. But where
> there is no obvious absurdity, and simply assertions by either side that
> its own interpretation yields the more sensible result, there is room for
> error."

31.    The Owners argued that the Charterers' construction of additional clause 98 was so
favourable to them, the Charterers, that it was difficult to conclude that that was what
the parties had intended. They pointed out that an option for additional years will
only be exercised if the market rates are above the time charterparty rates. They
accepted that the requirement that the options be declared six months before the time
in question meant that there would have to be an element of prediction involved so
that at the time when the options were to be exercised they were not "a one way bet".
They argued that, nevertheless, the probability was that they would only be exercised
if the Charterers, with their enormous experience, anticipated that the market rates
would be above the time charterparty rate.   They therefore argued that it was
inherently unlikely that the optional additional years, if opted for, would not be
favourable to the Charterers.  (In the event, the high prevailing market rates at the
times when the options had to be exercised meant that they turned out to be a one way
bet for the Charterers, but of course we were considering the intention of the parties at
the time when the time charterparty was concluded.) The Owners argued that it was
objectively unlikely that the parties would have agreed that there should be a profit
sharing arrangement for the first five years of the charterparty but that there should
not be one for the two optional additional years which would in all probability only be

69

46

- 18 -

relevant if they were profitable for the Charterers. In other words, they argued, in the context of a time charterparty with a profit sharing agreement, the Charterers' construction would give them a double benefit for the sixth and seventh optional additional years which, objectively, the parties could not have intended.

32.    Could the potential double benefit of the optional additional years have been intended? As we have already commented, there was a difference between the parties as to whether, for instance, it was proper to take into account the Charterers' argument that at the time of the conclusion of the time charterparty it was a "charterers' market". This was not an issue that had to be determined by us because there were two very relevant sets of facts that were known to both parties and that were clearly very relevant.

33.    Firstly, the charterparty rate of US$13,750 per day was one that the Owners needed to secure because it covered the financing and running costs of the vessel. Mr Darragh Waterkeyn's evidence was that the figure had been given to him by the chief accountant of the Owners' managers. Mr Benoit Timmermans's evidence was that when the charterparty was first discussed, the Golden Ocean representatives had made it clear that they required that rate in order to satisfy their bankers; his understanding was that it was needed to assist them with the financing of an aggressive VLCC building programme.

34.    Secondly, the charterparty rate that was agreed was above the market rate. This was accepted by Mr Darragh Waterkeyn in his evidence. Mr Timmermans's evidence to the same effect was supported by Clarkson's figures which showed that, in May 1999

47

the time charter equivalent rate on the spot market was about US$7,400 per day and the rate for three year time charterparties was about US$10,680. The Clarkson's figures were for a 150,000 deadweight bulker. The "CHANNEL ALLIANCE" was a little larger at 170,000 deadweight but the open market rate would only have been marginally higher. Although counsel for the Owners argued that the Clarkson's figures were no more than a compilation of the fixtures known to them and therefore not truly representative of the market, it was undeniable that the fixture was at a considerable premium above the going market rate.

35. Obviously over the period of the time charterparty the Charterers hoped that the charterparty would be profitable. However, the extent of the Charterers' exposure is demonstrated by the fact that if the market simply remained flat for the first year then by reference to the spot market rate at the time of fixture the Charterers would have been facing a loss of approximately US$2.3 million.

36. The Charterers had a bullish view of the market but that did not disguise the fact that, in conceding the time charterparty rate which the Owners were guaranteed to receive as a minimum for five years, they were taking a serious gamble which doubtless they hoped would turn out well for them but which could have been expensive. After all, it must not be forgotten that the spot market rates had to improve by about US$6,350 per day or about 85% before the Charterers would not show a loss on a daily, never mind accumulated, basis.

37. The fact that optional extensions often carry a higher rate of hire was neither here nor there. Viewing the transaction as a whole, it was clearly beneficial to the Owners and

48

- 20 -

potentially disadvantageous to the Charterers. One could not, therefore, conclude that in the context of the whole transaction the option sharing agreement not applying to the additional optional years was such an advantageous arrangement to the Charterers that that could not have been the objective intention of the parties. Even without considering other commercial factors that might or might not have been relevant, the two facts that were known to both parties at the time when the charterparty was concluded meant that there was no reason not to give effect to the wording actually agreed by the parties.

38.     The Owners relied on two further arguments. Firstly, they pointed to the fact that in points of defence it was pleaded that, at their highest, the words of paragraph 6 merely recorded that if the Charterers' exercised their option to extend the charterparty, the parties would consider the question of possible profit share during that optional period. The pleading concluded that, in other words, at their very highest, the words recorded "an agreement to agree" which was unenforceable.

39.     We accepted Mr Timmermans's explanation that this was a pure legal argument that he had left to the lawyers. Counsel for the Charterers explained that it was an argument that had been pleaded by him before he had seen any witness evidence and it was not an argument that was pursued on behalf of the Charterers at the hearing. We did not consider that that pleading undermined our conclusion.

40.     The Owners also pointed to the fact that on 12 July 2007 the vessel's new managers (the original Golden Ocean company having gone into receivership in January 2000) offered the Charterers US$5 million in exchange for the Charterers giving up the right

72

49

to exercise their options for two additional years. The response from the Charterers was to suggest that the figure was far too low. The Charterers' representative in question (who had not been involved in the original transaction) commented on 16 July:-

> "Thanks yours which we have discussed internally here ... the market for two years today ... gives us surplus value of about USD10,900,000 (taking net figures and our 50% profit sharing)".

However, by 30 July the same broker from the Charterers advised the Owners:-

> "Have now checked the CP which stipulates that the profit sharing is only applicable for the base period of five years. There is no profit sharing for the optional years (ie year 6th and 7th)".

41. The evidence of Mr Timmermans was that in July 2004 his team of five or six chartering brokers were concluding about 150 fixtures a year. It seemed to us to be perfectly possible that the discussion referred to in the message of 16 July may have focused on market rates and what the vessel would be worth for the next two years and the charterparty was indeed only checked prior to the second message being sent out. Given the volume of business conducted by the Charterers, the fact that the participants in the discussion might initially have assumed that the profit sharing extended to the optional additional years, did not establish that at the time of the conclusion of the charterparty that had indeed been the intention of the Charterers.

42.    Although the claim for rectification was not withdrawn, it was not pursued with any
       vigour at the hearing. We had little hesitation in concluding that the evidence simply
       did not show that there was a continuing common intention that the profit sharing
       should extend to the optional additional years, albeit without balancing or netting off.

43.    For the sake of completeness, we have to deal with one final possible basis of claim.
       As part of their claim, the Owners claimed their share of the profits during what they
       categorised as the "marginal period" between 10 September and 10 November 2006,
       which they calculated to be US$1,664,273.06. Although a separate claim for that sum
       was not advanced at the hearing, arguably it was properly to be considered as a
       separate claim that formed part of the Owners' larger claim. For the avoidance of any
       doubt, we should make it clear that we did not consider that a claim for the marginal
       period could survive our conclusion that the profit sharing agreement did not extend
       to the sixth and seventh optional additional years. The last sentence of additional
       clause 35 read:-

              "The 2 months more or less in Charterer's option to apply only on the
              final period."

       That sentence meant that if the Charterers had not declared their exercise of the option
       for the additional sixth year, then the two months' option would have been properly
       considered to be part of the five year basic charterparty period and the profit sharing
       agreement would have applied to it. However, the last sentence of additional clause
       35 meant that when the options for the additional years were exercised, then the two
       months additional period extended firstly to the sixth year and then to the seventh

                              74                                              51

- 23 -

additional year. Putting it another way, the characteristics of the two months option were derived from the final period of the charterparty which, in the event, was the optional additional seventh year. Since the profit sharing agreement did not apply to the optional additional sixth or seventh year, it could not apply to the optional extension that was agreed to relate only to that final period.

44.    It followed that the Owners' claims failed completely. Both parties were content that costs should follow the award so that it was appropriate for the Owners to bear their own costs and the costs of the Charterers. It was also appropriate that the Owner should be liable for the costs of our award.

75

52

IN THE MATTER OF THE
ARBITRATION ACT 1996

AND

IN THE MATTER OF AN
ARBITRATION


BETWEEN:-


GOLDEN PRESIDENT
SHIPPING CORPORATION

Claimants
(Owners)


- and -


BOCIMAR NV

Respondents
(Time Charterers)


"CHANNEL ALLIANCE"


Charterparty dated
23 June 1999


FINAL ARBITRATION
AWARD

53

# Exhibit 2



Neutral Citation Number: [2008] EWHC 130 (Comm)

Case No: 2007 FOLIO 1322

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 31/01/2008

Before :

**THE HONOURABLE MR JUSTICE COOKE**

- - - - - - - - - - - - - - - - - - - -

Between :

**GOLDEN PRESIDENT SHIPPING**
**CORPORATION**                          **Claimant/**
**- and -**                                   **Applicant**
**BOCIMAR NV**
**Defendant/**
**Respondent**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

Mr C Priday (instructed by Winter Scott) for the Claimant
Mr H Byam-Cook (instructed by Lax & Co) for the Defendant

Hearing dates: 30 January 2008
- - - - - - - - - - - - - - - - - - - -

## Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

THE HONOURABLE MR JUSTICE COOKE

### Mr Justice Cooke :

#### Introduction

1.  This is an appeal under section 69 of the Arbitration Act 1996, brought with leave, against an Arbitration Award dated 13 August 2007 relating to a dispute under a long term time Charter Party dated 23 June 1999 between the Appellant Owners and the Defendant Charterers. The Owners were the Claimants in the arbitration and the Charterers were the Respondents. I shall for convenience refer to them throughout as Owners and Charterers.

2.  Under the terms of the Charter Party, the vessel Channel Alliance was let to the Charterers for a period of 5 years, with Charterers' options to extend for a further 6th and 7th year. Additionally, the charter provided for a further 2 months plus or minus, at Charterers' option, for the final period of the charter, whether extended by the further 6th or 7th year or not. Additionally there was provision for a Charterers' option to add any off hire periods to the charter. The Charter Party was on the standard NYPE form with additional clauses. Though irrelevant for current purposes, the Owners had become party to the charter by novation in July 2004.

3.  The vessel was delivered into the Charter Party on 10 September 1999 and in due course the Charterers exercised their options for the additional 2 years and ultimately the additional 2 months, so that the vessel was ultimately redelivered in November 2006.

4.  The rate of hire under the charter was $13,750, referred to as the floor rate, with a profit sharing agreement contained in clause 98. The dispute between the parties turned upon the proper construction of this clause. Because considerable profits were made in the last 2 years of the charter, substantial sums of money turn upon this issue.

#### The Charter Party

5.  The relevant terms of the charter are as follows:-

    > "4.    The Charterers shall pay for the use and hire of the said vessel at the rate of $13,750 per day or pro rata including overtime net of commission....hire to continue until the hour of the day of her redelivery....
    >
    > 35.    PERIOD
    >
    > Five (5) years two (2) months more or less in Charterer's option timecharter.
    >
    > Charterer's option declarable latest at the end of the 54th month for an additional 6th year timecharter.
    >
    > Charterer's option declarable latest at the end of the 66th month for an additional 7th year timecharter.
    >
    > The 2 months more or less in Charterer's option to apply only on the final period.

### 58.    OFF-HIRE EXTENSION

Charterers have the option to add off-hire period, if any, and option to be declared 30 days before redelivery.

### 98.    PROFITSHARING

(1)    Charterers and Owners agree that over the basic charter period of 5 years both Owners and Charterers will share the profit made on a 50/50 basis on the running of the vessel as compared to the floor rate of charter hire i.e. USD 13,750/day. The profit made will be calculated by comparing the floor rate of USD 13,750/day with the average rate reflected in the Baltic Cape Size Index (daily average of the routes 8-9-10-11 as published by the Baltic Capesize Index to be adjusted upwards by usd 975 per day or prorata to reflect the value of the MS Channel Alliance compared with the 'index' vessel) during any year of the basic charter period.

(2)    Should during the currency of the Charter the Baltic Cape Size Index cease to exist as a means of comparison or should the parameters of the Index which existed at the time of conclusion of the Charter be amended, parties will agree a new reference rate. If parties cannot agree on such reference rate, in order to determine same parties will appoint a reputable London broker by mutual consent, or, if parties cannot agree on such broker each party will appoint their own broker who will both appoint a third broker should the two appointed fail to agree. The decision of the appointed broker or brokers will be binding.

(3)    At time of fixing the Baltic Capesize Index (B.C.I.) is described as follows:

"Timecharter routes : based on a Baltic Capesize of the following specification : 161.000 mt dwt, not over 10 years of age, 176.000 cbm grain, max. loa 280 m,max. beam 45 m. 14 knots laden, 14,5 knots ballast on 52 mts fuel oil, no diesel at sea.

- Route 8 : Delivery Gibraltar-Hamburg range, 5-15 days ahead of the index date, trans Atlantic round voyage duration 30-45 days, redelivery Gibraltar-Hamburg range, 3.75 per cent total commission

- Route 9 : Delivery ARA or passing Passero, 5-15 days ahead of the index date, redelivery China-Japan range, duration about 65 days, 3.75 per cent total commission

- Route 10 : Delivery China-Japan range, 5-15 days ahead of
the index date, round voyage 30-40 days, redelivery China-
Japan range, 3.75 per cent total commission

- Route 11 : Delivery China-Japan range, 5-15 days ahead of
the index date, redelivery ARA or passing Passero, duration
about 65 days, 3.75 per cent total commission."

(4)      At the end of each year of the basic charter period the
profit or loss for that year will be assessed by comparing the
average Baltic Capesize Index rate for that year (adjusted
accordingly) with the basic charter rate over the number of days
that the vessel has been in service excluding days of off-hire.

(5)      If a profit has been made in any particular year an
advance in respect of Owners' share will be made by Charterers
to Owners at the end of that year provided however that if
losses have been made in the previous year(s) which are greater
than the profit made no advance will be made. If during the
currency of any year Charterers anticipate that there will be an
overall loss taking into account he previous year(s) Charterers
will be entitled to make deductions from hire to up to the total
amount of profit already advanced to Owners during the
preceding years to cover such loss.

(6)      For profit sharing purposes, optional year(s), if
declared to be considered on their own.

(7)      Example profit sharing

- year 1 : loss USD 300.000

No distribution/no reduction

- year 2 : profit USD 100.000 -

No distribution/no reduction

- year 3 : profit USD 400.000 -

Distribution of USD 100.000 to GO

(i.e. 50% of USD 400.000 - (USD 300.000-USD 100.000))

- year 4 : profit USD 500.000

Distribution of USD 250.000 to GO

- year 5 : loss USD 400.000

Charterers can deduct USD 200.000 from the hire (upto
maximum the advances)"

## The Parties' Contentions

6.    For the purpose of this judgment, as in the Arbitrators' Award, I refer to the 7 sub-paragraphs of clause 98 by the numbers which appear by them in the copy of the clause set out above in this judgment.

7.    Whilst the Charterers originally contended in the Arbitration that the 6th paragraph of clause 98 constituted no more than an agreement to agree about profit sharing in the 6th and 7th optional years, they abandoned that contention and submitted that the effect of this sub-paragraph, when read in the context of the charter as a whole, was to exclude the 6th and 7th years from the profit sharing arrangements. It was the Owners' contention that the effect of the 6th paragraph of the clause was to include the 6th and 7th years in profit sharing but to exclude them from the "set off" or "netting off" provisions set out in the first 5 paragraphs which applied only to "the basic charter period of 5 years".   The Arbitrators accepted the Charterers' submissions.

## The Commercial Background to the Charter

8.    At the Arbitration, the Owners argued that the Charterers' construction of clause 98 was so favourable to the Charterers that it was difficult to conclude that this was what the parties had intended.  In that context the Arbitrators found that there were 2 relevant sets of facts known to both parties at the time of concluding the Charter Party. First, it was known that the rate of $13,750 per day was required by Owners to cover the financing and running costs of the vessel. Secondly, that the Charter Party rate agreed was above the market rate. They further found that the Charterers had a bullish view of the market but were taking a serious gamble because spot market rates had to improve substantially for the Charterers not to show a loss on a daily and accumulated basis. The Arbitrators concluded that, in the context of the transaction as a whole, it could not be said that the disapplication of the profit sharing agreement to the additional optional years was so advantageous to the Charterers that it could not have been the objective intention of the parties.

9.    The Arbitrators did not thus rely on the commercial background to do anything other than counteract the argument put forward by Owners that it was unlikely that the parties would have agreed that there should be a profit sharing agreement for the first 5 years of the Charter but not for the 2 optional additional years, which would in all probability only arise if the Charterers foresaw future profits, since otherwise they would not exercise the option.

10.    I can therefore focus upon the wording of clause 98 in the context of the Charter as a whole, as did the Arbitrators. The Arbitrators took the view that the profit sharing obligation was set out in paragraph 1 of clause 98 and that the scope of the obligation was, by the terms of that paragraph, specifically limited to "the basic charter period of 5 years". The Arbitrators placed great weight upon those words in the first line and the words in the last line referring to "any year of the basic charter period".

11.    It was the Arbitrators' view that paragraphs 1-5 of clause 98, when coupled with paragraph 7 provided for profit sharing on a netting off basis for the 5 year basic charter period and that the words of paragraph 6 were insufficiently clear to alter the express provision in paragraph 1 which "clearly and unambiguously restricted the

profit sharing agreement to those 5 years". They found that, in the context of the whole clause, the meaning of paragraph 6 was clear but at no point in the award do they appear to have grappled with the words used.

12.     Whilst the Arbitrators referred to the structure of the clause and went through the various sub-paragraphs of it in order to reach the conclusion which they did and referred to clause 35 in addition, in seeking to construe the wording of paragraph 6 in the context of the Charter Party as a whole, in my judgment they failed to give effect to the clear meaning of the paragraph itself.

13.     The structure of clause 98 is, to my mind, relatively clear. Paragraph 1 of the clause does set out the basic obligation to share profits on a 50/50 basis "over the basic Charter period of 5 years". The manner in which the profit is to be assessed is set out by requiring a comparison of the floor rate of $13,750 per day with the average rate reflected in the Baltic Cape Size Index (as adjusted upwards in the manner set out in the paragraph) "during any year of the basic charter period". The second paragraph then provides for the contingency of the Baltic Cape Size Index ceasing to exist "during the currency of the Charter." Whilst the Owners placed weight upon this expression of duration, the Charterers pointed out that this was a contingency provision only and that the scope of the obligation set out in the first paragraph could not be changed thereby. The third paragraph set out details of the Index referred to in paragraph 1 and adds nothing to the issue of construction.

14.     The fourth and fifth paragraphs of clause 98 not only set out the set off provisions by which a balance is to be struck in the form of netting off profits and losses but also for the time and manner of payment of amounts due. In the fourth paragraph there is provision for the profit or loss for each year "of the basic Charter period" to be assessed by making the necessary comparison over the days of service in that year, excluding off hire. The fifth paragraph however makes it clear that the "netting off" is to be effected on a 5 year basis whilst providing for payments to be made as advances in respect of Owners' share of profit following the end of year assessment, provided that there is an overall net profit at that stage in the light of previous years. It also provides for a claw-back by the Charterers on the basis of an anticipated loss in any particular year where advances have already been made in respect of profits. During any year in the 5 year period, the Charterers can, if they anticipate an overall loss, taking into account the previous years' figures, make deductions from hire but only to the extent of the advances already made in respect of profit. Owners thus always remain entitled to the floor rate of $13,750 per day and ultimately, by the terms of paragraphs 1-5 of clause 98, obtain a 50% share in any net profit over the 5 year term. During the course of that term they may receive advances or suffer claw-backs as the profit/loss figures or anticipated profit/loss figures fluctuate.

15.     The seventh paragraph of clause 98 sets out an example of profit sharing which shows how this works over the 5 year period.

16.     It is against this background that reference is to be made to the terms of paragraph 6 of the clause which reads:-

        "For profit sharing purposes, optional year(s), if declared to be considered on their own."

17.  In my judgment, the meaning of this sentence is clear. It cannot mean what the Arbitrators have effectively taken it to mean, namely that the optional years are not to be considered for profit sharing purposes. To the contrary, there is express provision that, where an option is exercised, the year is to be considered for profit sharing purposes. I cannot see any other sensible meaning to be attached to this form of words.

18.  As Owners submitted, the significance of the clause is that "optional year(s), if declared" are to be considered separately from the 5 year netting off process set out in the balance of the clause. The sentence does not exempt those years from profit sharing but exempts them from the balance to be struck in respect of profits and losses in the basic Charter period. The sentence in paragraph 6 is not capable of a great deal of analysis but it plainly requires years 6 and 7, if the option is exercised, to be considered in the context of profit sharing. The words "on their own" equally plainly require these years to be considered individually, as opposed to being taken in conjunction with the earlier 5 years.

19.  The reason for the use of terminology referring to "the basic Charter period" in paragraph 1 of the clause is because that paragraph, as well as paragraph 5 makes it plain that profits are to be shared on a 50/50 basis with an assessment over the full 5 year period albeit that interim calculations are made on a yearly basis. The wording at the beginning of paragraph 4 - "at the end of each year of the basic Charter period" is explicable on the same basis. In short, paragraphs 1-5 of clause 98 set out the position for the profit and loss sharing arrangement, on a netting off basis, for the 5 year period, whilst paragraph 6 makes it plain that profit sharing is to persist for the optional years, if declared, but that such years are to be considered separately in the context of assessment of profits for sharing.

20.  I do not consider that paragraph 7 of the clause in anyway militates against this conclusion. There, an example is given of profit sharing over the 5 year basic Charter period, without reference to the optional years. The example however illustrates how the netting off provisions work as between profits and losses in various years. This is the most complicated part of the calculation and no example is given as to how otherwise to carry out the assessment of profits and losses for sharing in any particular year. Since the example shows how to net off the figures over the 5 years, there is no requirement to incorporate years 6 and 7 because they stand on their own.

21.  There is no difficulty about the point of assessment and payment. Paragraph 6 refers to "profit sharing", without the netting off and thus incorporates the profit sharing provisions of the contract in relation to annual assessment and payment. To the extent that no specific time is set forth, it is self evident that a reasonable time after the year end is to be chosen for calculation and payment.

22.  Both parties sought to fortify their arguments by reference to other clauses in the Charter Party. The Charterers and the Arbitrators both considered that clause 35 was of some assistance in as much as an unusual form of words was there adopted in referring to the option "for an additional 6th year timecharter" and "an additional 7th year timecharter". The suggestion was made that significance is to be attached to these words, as opposed to the use of the word "extension". I do not think that these words will bear the weight which is suggested. The very first line of the clause refers to "5 years 2 months more or less in Charterers option timecharter" which in itself is

an unusual form of words. The references to the optional years simply repeat the word "timecharter" which appears at the end of that sentence.

23.    Arguments were addressed to the existence of the Charterers' plus or minus 2 months option which applied only to "the final period". I agree with the Charterers' submission that not much is to be gained from this provision since, as the Arbitrators found, the 2 months extension (if the Charterers so exercise their option) must take its character from the preceding period to which it is an extension. Thus, on the Owners' argument, if the Charterers were to exercise an option for a 6th or 7th year and then an additional 2 months at the end of either of those years, that 2 month period would fall within the regime attributable to the final year. It would make no difference whether the final year was a year of profit sharing without netting off or a year when there was no profit sharing at all. The debate therefore adds nothing to the strength of either party's argument.

24.    A more general point arises however in relation to the exercise of the 2 month option, as it does to the Charterers' option to add the off hire period to the Charter. If either or both of these options were exercised at the end of the 5 year period, there is no doubt (and it was not argued to the contrary) that profit sharing would apply to the periods in question. When clause 35 is considered, there is therefore no basis in the clause itself for suggesting that the terms applicable to the 5 year charter would not also be applicable to the additional time for which any option was declared, whether it be for the 6th year, the 7th year, the final 2 months or, under clause 58, for the off hire period.

25.    In the ordinary way the terms and conditions of the Charter would apply to any extension under it, save to the extent that the Charter provided otherwise. To ascertain the position it is necessary therefore to return to clause 98 in order to see what that provides. For the reasons that I have already given, it is clear to me that paragraph 6 of clause 98 expressly provides for the profit sharing to apply to optional years declared by the Charterers on a separate basis from the netting off of shared profits and losses in the basic Charter period of 5 years.

26.    As Owners argued, although this point did not attract favour with the Arbitrators, there is a possible commercial explanation for this difference. The parties agreed to a 5 year basic Charter period with the apportionment of risk as set out therein. There were pluses and minuses on both sides since the Owners committed themselves to a Charter for 5 years and thus deprived themselves of the benefit of any upward movements in the market, for which they were prepared to accept a basic rate of hire and a profit share. The Charterers committed themselves to a fixed rate, gauged at a level which they thought appropriate, given their view of the likely movement of the market in the next 5 years, with the profit sharing arrangement and claw-back of losses, if any. There was commercial risk in this in both parties' assessment of the likely movement of the market over the 5 years to which they were definitely committed. By contrast, the Charterers were given an option in respect of the 6th and 7th years which they would doubtless only exercise in the event of a favourable market at the time or a foreseen improvement in the market over the 6th or 7th year in question. The Owners were bound to accept the exercise of the option and had no further opportunity to consider the rates at the time or the future movement of the market. Thus it can be considered likely that the option would only be exercised in the event of an upward moving market, as in fact turned out to be the case. In such

circumstances there is a commercial logic in the Owners being able to take a share of the profit in respect of any optional year, without any claw-back of losses. The option is exercised for a year at a time and profit is to be assessed in respect of that year alone.

### Conclusion

27.    The Owners are therefore entitled to a 50% share of the profits made in each of the 6th and 7th years and also the final 2 months declared by the Charterers at the end of the 7th year. The Owners calculated their 50% share of the profits for the additional 2 years and 2 months as $14,865,003 but the Charterers' calculation, if wrong on principle, as I have held them to be, gave rise to an entitlement of $14,679,557.84. The Owners had applied for a Partial Award in that amount, together with interests and costs, leaving the balance to be determined by the Arbitrators later.

28.    I therefore vary the Award so as to hold that the Owners are entitled to the sum of $14,679,557.84 together with interest and the costs of the appeal. Any balance claimed is a matter for the Arbitrators to determine.

29.    It may well be possible for the parties to agree on the interest owed and other ancillary matters including the costs of the Arbitration and Award but if not, I will determine such issues at the formal hand down of this judgment.

# Exhibit 3

2007 Folio 1322

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

The Honourable Mr Justice Cooke

BETWEEN:-



GOLDEN PRESIDENT SHIPPING CORPORATION

Claimant / Appellant

- and -

BOCIMAR N.V.

Defendant / Respondent

---------

**JUDGMENT**

---------

UPON the Claimant's appeal brought with leave against an Arbitration Award dated 13th August 2007 ("the Award");

AND UPON hearing Counsel for the Claimant and Counsel for the Defendant;

IT IS HEREBY ORDERED AND DIRECTED THAT:

1.    The Award be varied so that:

    (a)    Paragraph 6A of the Award reads "The Owners' claim succeeds."

    (b)    Paragraph 6B of the Award reads "The Owners be awarded the sum of US$14,679,557.84 plus interest thereon of US$2,250,111.53 as of 31

January 2008, the said interest increasing hereafter until payment by US$2,996.32 per day";

(c)    Paragraphs 6C, 6D and 6E of the Award are deleted.

2.    The Defendant shall bear and pay the costs of and occasioned by this appeal, to be assessed if not agreed.

3.    The matter be remitted to the Arbitrators to determine liability for the costs of the Arbitration and the Award.

4.    The Defendant's application for leave to appeal to the Court of Appeal be refused.

Dated 31st January 2008

# Exhibit 4

NOT FOR SERVICE OUT
OF THE JURISDICTION
**Claim Form**
(arbitration)

CLAIMANTS COPY

CLAIMANTS COPY

In the
High Court of Justice, Queen's Bench Division,
Commercial Court.

| | *for court use only* |
|---|---|
| Claim No. | 2007 – 1322 |
| Issue date | 31 – 8 – 07 |

In an arbitration claim between

Claimant
GOLDEN PRESIDENT SHIPPING CORPORATION



Defendant(s)
BOCIMAR NV

In the matter of an [intended] arbitration between

Claimant
GOLDEN PRESIDENT SHIPPING COPORATION
80 Broad Street
Monrovia
Liberia

Respondent(s)  *Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

BOCIMAR NV
De Gerlachekaai 20,
B 2000 Antwerpen 1
Belgium

RESPONDENT in Arbitration and DEFENDANT in these proceedings.

| Defendant's name and address: | BOCIMAR NV, De Gerlachekaai 20, B2000 Antwerpen 1, Belgium | ☐ This claim will be heard on: <br><br> at    am/pm <br><br> ☑ This claim is made without notice. |
|---|---|---|

The court office at

When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N8 Claim form (arbitration)

1

Claim No.

## Remedy claimed and grounds on which claim is made

1. The Claimant seeks an order giving permission to appeal pursuant to section 69 of the Arbitration Act 1996 against the Final Arbitration Award dated 13th August 2007 of Messrs Timothy Rayment, William Robertson and Mark Hamsher ("the Award").

2. The questions of law arising out of the Award are as follows

a. Whether upon the true construction of clause 98 of the Charterparty dated 23rd June 1999, optional years (if any) were to be considered for profit-sharing purposes, so that the profits in those years had to be shared between Owners and Charterers

b. whether it is correct as a matter of law in an issue of construction of a Charterparty term

i. to consider first the literal meaning of the term before giving any consideration to the commercial context of the transaction

ii. to have regard to the (apparent or perceived) relationship between the rate of hire and

a. the financing and running costs of the vessel

b. market rates

and to use these considerations as an aid to construction

iii. to have regard to whether the transaction as a whole is perceived to be "beneficial" or "advantageous" or "profitable" to one party or the other, so as to use that perception to influence the interpretation of a term.

3. The grounds upon which the Claimant contends that permission should be granted are set out fully in the Grounds of Application annexed hereto and are in summary that

a. The decision of the tribunal was obviously wrong and/or

b. The foregoing issues raised matters of general importance and the decision of the Tribunal is at least open to serious doubt.

4. On appeal, the Claimant seeks the variation of the Award so as to allow its claim to profit-sharing for the optional years, alternatively the setting-aside and/or remission of the Award.

5. In addition, the Claimant seeks such further relief, including an order for costs, as may be appropriate upon the Court's determination of these applications.

2

Claim No.

The claimant seeks an order for costs against
the Defendant / Respondent Charterers, SOCΩMAR NV.

Statement of Truth

Does or will your claim include any issues under
the Human Rights Act 1998          Yes          No

Statement of Truth

\*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.
\* I am duly authorised by the claimant to sign this statement

Full name Timothy James Houghton

Name of claimant's solicitor's firm Winter Scott Solicitors

signed _____          position or office held Partner

\*(Claimant)(Claimant's solicitor)          (if signing on behalf of firm or company)

\*delete as appropriate

Winter Scott Solicitors,
St Olave's House,
Ironmonger Lane,
London,
EC2V 8EY.
DX 42602 Cheapside
Tel:- 020 7367 8989
Fax:- 020 7726 2371

Claimant's or claimant's solicitor's address to
which documents should be sent if different from
overleaf. If you are prepared to accept service by
DX, fax or e-mail, please add details.

3

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION


BETWEEN:-


### GOLDEN PRESIDENT SHIPPING CORPORATION
Applicant (Claimant
Owners)


- and -


### BOCIMAR NV

Defendant (Respondent
Charterers)


### "CHANNEL ALLIANCE"


## GROUNDS OF APPLICATION


1. These are the grounds upon which the Applicant, Golden President Shipping
Corporation ("Owners"), seeks (pursuant to section 69 of the Arbitration Act 1996)
permission to appeal on points of law in the Final Arbitration Award dated 13th August
2007 of Messrs Timothy Rayment, William Robertson and Mark Hamsher ("the
Award"). On these same grounds, Owners seek the variation, setting-aside and/or
remission of the Award.


4

2. Owners were the Claimant in the arbitration and the Defendant ("Charterers") was the Respondent.

3. The Claimant Owners also rely upon the witness statement of their solicitor Timothy Houghton, dated 31st August 2007, to which is exhibited a paginated bundle containing the Award and the Charterparty marked TH1. Page references in these Grounds (contained in square brackets) are references to the pages of that bundle.

### Outline of the dispute

4. The dispute arose under a long-term time Charterparty dated 23rd July 1999 [p1] whereby the vessel CHANNEL ALLIANCE was let to the Charterers for a period of 5 years, with Charterers' options to extend for a 6th and 7th year (there was also a Charterers' option for plus or minus two months on the final period). The Charterparty was on the NYPE form. Owners subsequently became party to the Charterparty by a novation in July 2004.

5. The vessel was delivered into the Charterparty on 10/9/1999. Charterers exercised their options for the additional two years and for the extra two months, re-delivering in November 2006.

6. The remuneration scheme under the Charterparty comprised two elements: a fixed rate of US$13,750 applying throughout the currency of the Charterparty (including any optional years) and a profit-sharing agreement, contained in clause 98 [p23]: to the extent that during the currency of the Charterparty the Baltic Capesize Index ("the BCI", adjusted slightly to reflect the superior quality of the vessel) went above the floor rate of US$13,750, this "profit" was to be shared 50/50 between the parties. In effect, if the market (as reflected in the BCI) improved beyond the floor rate, the parties were to share equally in that improvement.

7. However, the parties recognised that losses might also be made. The main feature of the profit share clause (the element which the arbitrators described as "complicated" — para 15 of their Reasons [p39]) was an agreement that profits earned in any of the initial 5 years were to be off-set by losses made in any other of the initial 5 years. This off-setting calculation, variously referred to in the parties' submissions as "netting" or "netting off" or "balancing", is illustrated by an example in paragraph 7 of

clause 98. Thus for profit-sharing purposes, the first 5 years were to be considered together.

8. As for the possible optional 6th and 7th years, the clause simply says *"For profit-sharing purposes, optional years (if declared) to be considered on their own."* [referred to as paragraph 6 of clause 98 and at p24 of TH1]. In other words (Owners contended), profits/losses in the first 5 years were not to be off-set against profits/losses in the optional years 6 and 7 (nor were profits/losses in years 6 and 7 respectively to be off-set against each other); the optional years were to be considered for profit-sharing purposes, but on their own.

9. The entire dispute centred upon the meaning of this sentence, for (in July 2004) Charterers first claimed that there was no obligation upon them to share profits in the optional years. Those two extra years have produced a "profit" of nearly US$ 30 million, so that if the scheme applied to them, Owners would be entitled to at least US$ 14,679,558. But Charterers denied that any sum was due to Owners.

10. Charterers' pleaded case was that nothing was due to Owners because (they said among other things) *"For profit-sharing purposes, optional years (if declared) to be considered on their own."* was an unenforceable "agreement to agree", by which the parties had agreed to discuss or "consider" profit-sharing in the optional years. This argument was abandoned by Charterers at the hearing. Instead, Charterers contended at the hearing that the effect of paragraph 6 was that any optional years were not to be considered at all for profit-sharing purposes.

11. The arbitrators appear to have accepted this argument, although (as set out below) their reasons for doing so are far from clear and, in Owners' submissions, manifestly wrong in law.

## Summary of the grounds of appeal

12. In summary, the principal errors in the Award are as follows:

   a. Although paragraph 6 was the key provision in the dispute and the basis of Owners' claim, being the only explicit allusion to the optional years in the

$\frac{3}{6}$

context of profit-sharing, the arbitrators appear to have failed to decide (or articulate) what that sentence meant.

b. Instead of construing clause 98 as a whole, they have construed it piecemeal: having read the opening paragraphs of the clause as referring to profit-sharing in the basic charter period of 5 years, they then decided that paragraph 6 was "*insufficiently clear to alter*" the effect of the earlier paragraphs: Reasons paragraph 27 [p44]. Rather, they should have asked themselves whether clause 98 as a whole manifested an intention that the optional years should be considered for profit-sharing purposes; it did, despite the fact that the opening paragraphs refer (logically enough) to the initial fixed (non-optional) period of 5 years.

c. For the arbitrators to consider whether paragraph 6 was seeking to. "*alter*" the effect of the preceding sentences was wholly misconceived:

   1. If one sentence of a clause refers to one period, while the next refers to another, neither is purporting to "*alter*" the other - they are merely dealing with different periods.

   2. The arbitrators wrongly concluded that the opening paragraphs manifested an intention that there should not be profit-sharing during the optional years, hence finding it necessary to see if paragraph 6 "altered" that result.

   3. Contrary to the arbitrators' apparent (and erroneous) conclusion, the opening paragraphs of clause 98 do not "*clearly and unambiguously restrict the profit-sharing agreement*" to the basic 5 year period, in the sense of excluding any further profit-sharing. To do that, there would have had to be some term to the effect that profit-sharing was to be in the basic 5 year period "*only*". No such term appears anywhere in clause 98.

d. The arbitrators contradicted themselves about paragraph 6: having said that its meaning was "*not obvious*" (Reasons, paragraph 25) [p43], and then said that it was "*insufficiently clear*" to affect what preceded it, the arbitrators then say

within the same paragraph that, in the context of the whole clause, *"its meaning was clear"* (Reasons paragraph 27) [p44]. But they fail to analyse or state what that meaning is.

e.  If the arbitrators are to be understood as accepting the Charterers' oral arguments about paragraph 6, then they must have accepted the proposition that *"to be considered"* or *"to be considered on their own"* means *"not to be considered"*. This is a plain failure to give the words their ordinary and natural meaning.

f.  Despite having cited the decision in *ICS v West Bromwich BS* [1998] 1 WLR 896 to the effect that *"the meaning of the Charterparty was to be ascertained objectively by reference to 'the meaning which the documents would convey to a reasonable person having all the knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract'"*, the arbitrators then preceded explicitly **not** to apply this approach. Instead they adopted a misconceived two-stage process, which purported first to construe the Charterparty *"solely on the basis of the words used"* and then to *"test that conclusion"* by reference to the commercial background to the transaction and the circumstances known to the parties: Reasons, paragraphs 16 and 30 [p40 and p45].

g.  The arbitrators thereby explicitly and wrongly divorced the construction of the clause from its commercial context.

h.  In any event each of the two stages adopted by the arbitrators was profoundly flawed. Their (first) literalistic test was wrong in law for the reasons outlined above and developed below.

i.  As for their consideration of the "general commercial context", this was again replete with error:

   1.  The arbitrators wrongly considered two matters to be *"clearly very relevant"* (Reasons paragraph 32) [p47].

   2.  Consideration of these two allegedly relevant matters led the arbitrators to the erroneous conclusion that *"viewing the transaction*

*as a whole, it was clearly beneficial to the Owners and potentially disadvantageous to the Charterers".*

3. The arbitrators then wrongly used this mistaken view that somehow Charterers were accepting a greater commercial risk under the whole transaction, to give Charterers the benefit of the doubt on the construction of an individual clause: Reasons paragraph 37 [p48]. This is a wholly novel and mistaken approach to the construction of a contract.

4. The first factor considered to be *"clearly very relevant"* to construction was that the fixed or floor rate of hire was sufficient to cover the Owners' financing and running costs: Reasons paragraph 33 [p47]. Yet this must be a trite observation for almost every Charterparty, for few if any owners can afford to trade at a loss. It is not a sound or appropriate aid to construction of the contract. Were it otherwise, in any issue of construction of a Charterparty, the tribunal would need to enquire into the financing and running costs of the vessel.

5. The second allegedly very relevant factor was that the rate of hire was above the market rate: Reasons paragraph 34 [p47]. Leaving aside the errors which led the arbitrators to express this conclusion, the perceived relationship between the agreed hire and market rates cannot be a sound or appropriate aid to construction of the contract. Were it otherwise, in any issue of construction of a Charterparty, the tribunal would need to enquire into market rates prevailing at the date of the fixture, so as to give the party perceived to be "taking more of a risk" the benefit of the doubt on some issue of interpretation.

6. The arbitrators' inference as to the benefits and risks of the transaction, that it was beneficial to Owners and potentially disadvantageous to Charterers, was mistaken and one-sided. In any Charterparty, particularly a long-term one, the parties take equal and opposite commercial risks: the advantage to the Charterers in having

the vessel on charter in a rising market is matched by the Owners' disadvantage in being unable to trade in that market themselves; fixing at any rate results in symmetrical risks for Owners and Charterers respectively if the market moves. The arbitrators wrongly thought that all commercial risk of market movement under a time charter was assumed by Charterers (Reasons paragraph 21) [p13] when both Owners and Charterers take a risk when fixing a rate that the market will move in an unfavourable direction. This infected their later view that this long term fixture was beneficial to Owners and potentially disadvantageous to Charterers (Reasons paragraph 37) [p48].

7. In any event this inference was not a legitimate aid to the construction of clause 98 (not least because it was a clause designed to achieve some equality of risk by dividing profits equally). The arbitrators had to decide upon the meaning of the clause in its (true) commercial context. They were not entitled to say that, because the Charterers were *"taking a serious gamble"*, an issue as to the meaning of a clause should be resolved in their favour. A subjective view as to the potential profitability of a contract is not a valid or reliable guide to its construction.

j. Moreover, the arbitrators appear to have treated their extrapolation that *"viewing the transaction as a whole, it was clearly beneficial to the Owners and potentially disadvantageous to the Charterers"* as part of the commercial background or "matrix", and therefore a legitimate aid to the construction of the Charterparty (Reasons paragraphs 32-37) [p47-48]. It is neither, in Owners' submission. The definition of legitimate circumstances or "matrix" in *ICS v West Bromwich BS* connotes facts or objective circumstances available to the parties. It cannot or should not extend to subjective (and entirely unreliable) inferences such as whether a transaction might or might not be *"beneficial"* or *"advantageous"* or *"profitable"*, or so perceived by one or

7/10

other party. Nor is it reliable to make any assumptions about whether a complex contract such as a Charterparty is above or below "market rates", so as to use these as a means to decide whether one clause should be construed in favour of Charterers or Owners.

k. If (as at one or more stages, the arbitrators appeared to have held) the effect of paragraph 6 was ambiguous, they ought to have construed it against Charterers as the proferens of that term: Reasons, paragraph 27 [p44].

l. The arbitrators also failed to give effect to the term of clause 98 (paragraph 2) which made provision for what was to happen if the benchmark (the BCI) ceased to exist *"during the currency of this Charterparty"*. As the arbitrators rightly conceded, this expression is broad enough to apply to any additional period over and above the basic 5 year period (Reasons paragraph 22) [p42]. This therefore showed that the benchmark, and therefore profit-sharing, was relevant even after the basic 5 years. In conjunction with paragraph 6, the intention for there to be profit-sharing at all times (basic and optional periods) was manifest. Yet, making the same error as elsewhere, the arbitrators discounted this term because it did not with sufficient clarity *"alter"* the earlier term as to profit-sharing on the initial 5 years.

## Permission to appeal

13. Owners contend that, for the foregoing summary reasons, the Award is obviously wrong. In particular, it is extraordinary to conclude that that a term that the optional years are to be considered for profit-sharing purposes (albeit on their own, rather than together with the fixed years) means that the optional years are to be ignored for profit-sharing purposes. The multiple errors in deciding this issue of law (for example, in breaking down the process of construction into two stages, literal then against a commercial context) make it manifestly an appropriate case for appeal.

14. Moreover it is just and proper for the Court to determine the issues of law. The parties did not exclude the possibility of appeal, rather both requested that the arbitrators give

their Reasons. This is a pure issue of construction of a Charterparty, arising without any other issues of fact or otherwise. The effect of clause 98 was the sole issue between the parties.

15. Furthermore, the issue will substantially affect the rights of the parties. Owners' claim of about US$ 14.7 million turns on this one issue. If Owners are successful on appeal, the Court may simply award the minimum sum of US$ 14, 679,557.84 (plus interest and costs) to Owners. This is therefore a very substantial claim, to be resolved by this question of law.

16. Although clause 98 was a specially agreed clause, the arbitrators' Award (and Owners' challenge thereto) raise a number of issues of general public importance, namely whether it is correct as a matter of law in an issue of construction of a Charterparty term

  1. to consider first the literal meaning of the term before considering the commercial context of the transaction

  2. to have regard to the (apparent or perceived) relationship between the rate of hire and

      a. the financing and running costs of the vessel

      b. market rates

      and to use these considerations as an aid to construction

  3. to have regard to whether the transaction as a whole is perceived to be *"beneficial"* or *"advantageous"* or *"profitable"* to one party or the other, so as to use that perception to influence the interpretation of a term.

17. These are questions which potentially affect any issue of construction and are therefore of the widest application and general importance. Owners contend that the arbitrators' conclusions thereon are, at the lowest, open to serious doubt.

18. Owners therefore seek permission to appeal.

Errors of law

19. The arbitrators should have construed clause 98 as requiring profit-sharing in the optional years as in the basic fixed period of 5 years. In particular, they should have held

a. If the parties had intended to exclude the optional years from profit-sharing, they would have said so in terms.

b. Instead these years are specifically referred to in clause 98 and *"for profit sharing purposes"*.

c. Moreover, these years are *"to be considered"* *"for profit sharing purposes"*. In other words the optional years are relevant to profit-sharing.

d. The meaning of *"on their own"* is plain: the earlier (first 5) years are to be considered together for profit sharing purposes - the profits in one year are to be off-set or netted or "balanced" against losses in other years. In contrast, the optional years are to be considered on their own, without any offset either against losses in the first 5 years or as between optional years. Thus, *"on their own"* means as individual accounting periods.

e. The context of paragraph 6, which must be a key guide to construction, is that the parties are logically working through the profit-sharing scheme: it follows the off-setting provisions of paragraph 5 and precedes the example of how off-setting works. This would be an odd place to put a provision that the optional years were not subject to profit-sharing at all. The parties intended the optional years to be subject to profit-sharing but not to off-setting.

f. The comparison benchmark is the BCI index. The parties make provision for this index ceasing to exist *"during the currency of this charter"* (the parties agreeing a substitute or an independent broker fixing a reference rate). This

phrase, which clearly contrasts with the concept of basic Charterparty period, is the clearest demonstration that profit-sharing will apply **throughout the currency of the Charterparty** (including if extended by the exercise of Charterers' options).

20. The arbitrators were wrong to interpret the example in paragraph 7 as indicating an intention that there should **not** be profit-sharing in the optional years (Reasons paragraph 26) [p43]:

   a. It only purports to be one example of how profit-sharing works; merely because it does not allude to other circumstances, including optional years, is hardly conclusive of an intention with regard to those circumstances.

   b. The complexity in clause 98 (as the arbitrators rightly recognised – Reasons paragraph 15) [p39] was the process of off-setting profits and losses in the first 5 years. This is what required an example to illustrate how it worked. For the very reason that the optional years were **not** subject to off-setting (because they were to be considered *"on their own"* and not together with the first 5 years), they were bound not to feature in the example.

   c. The arbitrators considered that the example should (on Owners' argument) have been captioned *"Example balancing"* or *"Example netting off losses against profits"*. But the parties did not use such words as "balancing" or "netting off" themselves in clause 98 and it would have been odd and misleading to introduce such language in an example. The example was an example of profit-sharing; the arbitrators' error was to assume that it purported to be a comprehensive example of all aspects of profit-sharing.

21. The arbitrators were wrong to assume that the reference to profit sharing over the basic 5 year period precluded the parties from also agreeing that there should be profit-sharing in the optional years (Reasons paragraph 27) [p44]:

   a. Merely because the clause begins by addressing profit-sharing in the fixed period of 5 years, this does not of itself manifest an intention to exclude the optional years from profit-sharing. It is logical first to address the inevitable

fixed period first, before dealing with the contingency that there might be
further years if an option were exercised in due course.

b. Because of the difference in the netting-off treatment between the basic charter
period and the optional years, the clause distinguishes between the two ideas.
It does **not** say *"no profit-sharing in any optional years"*.

c. Thus any of the following formulae would have been quite sufficient to make
the optional years subject to profit-sharing

1. *"For profit-sharing purposes, optional years [also] to be
considered."*

2. *"For profit-sharing purposes, optional years to be considered
but on their own."*

3. *"For profit-sharing purposes, optional years to be considered,
on their own."*

4. *"For profit-sharing purposes, optional years to be considered
on their own."*

d. The arbitrators wrongly assumed that the terms as to profit-sharing in the basic
period **excluded** profit-sharing in the optional years. Hence their error in
asking whether paragraph 6 *"altered"* the other paragraphs. But it does not; it
merely deals with a different subject-matter, namely the optional years, if any.

e. It is no different from the situation if the clause had begun *"profit-sharing in
years 1 and 2 to be calculated and off-set as follows..."* and then provided
*"For profit-sharing purposes years 3 to 5 to be considered on their own"*.
This second sentence is not intended to *"alter"* or derogate from the first; it is
simply applying a modified scheme to the later years.

22. The arbitrators supported their conclusion by two further errors of reasoning. First
they said that on Owners' construction it was necessary to imply a term as to when
any profit was to be calculated and shared, to the effect that profit should be shared at
the end of the years in question (Reasons paragraph 28) [p44]. But

a. there is no necessity to **imply** any such term: by providing that each optional year was to be considered on its own, it is clear from this **express** term that the profit-sharing would be at the end of each independent year

b. paragraph 2 had already made clear that the BCI was the comparator throughout the *"currency of the charter"*

c. reading clause 98 as a whole, the parties' manifest intention was that profit-sharing should be the same for optional and fixed years, save that for profit-sharing purposes the optional years should be considered on their own and not netted off against any other.

23. The arbitrators' second fallacious support was that clause 35 referred to the optional years as *"an additional 6th year timecharter"* and *"an additional 6th year timecharter"*. As the arbitrators recognised, too much should not be read into this unusual wording. But clause 35 does not support the view that there were 3 separate time charter periods; on the contrary, it shows that there was only one overall period or currency of the charter by stating that the final plus/minus two months option only applied to whatever was the final duration (moreover, all other provisions as to the completion of the charter, such as redelivery terms, plainly would only apply once, at the end of the total duration).

24. A much more significant aspect to clause 35 [p7] was wrongly overlooked by the arbitrators:

a. This clause provides that the basic period of 5 years may be extended by various options granted to Charterers: an option to extend for up to two months and/or options to extend for one or two more years (those optional years also being plus/minus two months, if the last).

b. Thus the basic period of 5 years could be extended by various periods, including 2 months, 10 months (one optional year minus 2 months), 12 months and up to 26 months (two optional years plus 2 months), at Charterers' option.

c. The arbitrators concede (as Charterers did) that profit-sharing would apply throughout if Charterers extended the basic period by 2 months (Reasons paragraph 43).

d. This is a recognition that the phrase *"the basic charter period of 5 years"*, upon which the arbitrators' reasoning is apparently founded as excluding additional or optional periods, does indeed include optional periods added by Charterers beyond 5 years. It does not mean, as the arbitrators appear to have decided in rejecting Owners' construction, that references to profit-sharing for *"the basic charter period of 5 years"* must mean 5 years and no more.

e. In other words, the arbitrators themselves admit that profit-sharing applies beyond 5 years and into a period added by the exercise of Charterers' option. This undermines their key conclusion, that *"the basic charter period of 5 years"* is the antithesis of optional extensions.

f. But once this is correctly appreciated, it must be wrong and illogical to say (as the arbitrators do) that clause 98 permits profit-sharing in the extra 2 months, if added by Charterers, but not in an extra 10 months, if added by Charterers. If the optional 2 months should be subject to the profit share, there is no logic or sense in not subjecting any optional added time to the profit-share. After all, these are all clause 35 options; moreover, the first two months (ie September/October 2004) would be the same period of time.

25. The illogicality of the arbitrators' reasoning on this point matched the oddity of their conclusion overall which was that the parties, having agreed to remunerate the Owners with a fixed rate plus a profit-sharing scheme for the first 5 years of the charter, should abandon the profit-sharing element for the final 2 years (if opted for), particularly when these could be assumed to be years when Charterers anticipated making a profit (otherwise they would not opt to extend the charter).

26. The arbitrators wrongly broke down the process of construction into two phases. Instead of applying the approach required by the decision in *ICS v West Bromwich BS*, construing the words in their commercial context, they avowedly adopted a literalistic approach (looking at the words in isolation) before then seeking to consider the commercial context of the contract in order to *"test"* whether that dislodged the literal interpretation: Reasons paragraphs 16 and 30. This is a fundamental error of approach, in the light of *ICS v West Bromwich BS*.

27. The arbitrators wrongly brought into consideration two matters (indeed they only referred to these two matters and stated them to be *"clearly very relevant"*) which were not legitimate or reliable aids to the construction of the charter. Neither

    a. the relationship between the fixed rate and the vessel's running and financing costs nor

    b. the relationship between the fixed rate and *"the market rate"*

was a relevant or proper basis for deciding in favour of Charterers on the issue of construction. No tribunal can sensibly construe a term of the contract by enquiring into these matters. In effect, the arbitrators were seeking to guide themselves by their assumptions as to the parties' commercial motives and expectations in relation to the contract.

28. The tribunal was in any event making a false comparison by comparing spot rates in May 1999 with the Charterparty rate (which was a 5 to 7 year charter with a host of terms, including a profit-sharing term), not least because it was a form of forward contract: delivery under the charter was not to take place until August/September 1999 (clause 14 at [p2]).

Case 1:08-cv-03490-DLC    Document 6-5    Filed 05/05/2008    Page 20 of 48

29. Moreover the potential profitability of the contract is a highly subjective matter and a most unreliable guide to construction. For example, the arbitrators themselves say that Charterers *"had a bullish view of the market"* (Reasons paragraph 36) [p48]. On such a view, the Charterparty was potentially very *"advantageous"* to them (to adopt the arbitrators' terminology), as events resoundingly proved (millions of dollars of profit in all years but one). This cannot affect the construction of clause 98.

30. The substantial improvement of the market over the duration of the Charterparty also illustrates the arbitrators' error in saying that the commercial risk of market movements was solely upon the Charterers (Reasons paragraphs 21 and 36-7). By fixing for 5-7 years Owners were also taking a risk with regards to market movement: they were foregoing the opportunity to profit 100% if the market strengthened considerably as it did. Instead of being free to trade the vessel for themselves in the market, they committed to this very long fixture and, in effect, were losing 50% of the profitability of a rising market.

31. Thus the arbitrators were in error in assuming that the transaction was so clearly *"beneficial"* to Owners and so *"potentially disadvantageous"* to Charterers. This was complete speculation on their part (not least being in ignorance as to how the Charterers were intending to trade the vessel). But in any event they were wrong in law to allow these considerations to influence their interpretation of clause 98.

32. If (as at one or more stages, the arbitrators appeared to have held) the effect of paragraph 6 was ambiguous, they ought to have construed it against Charterers as the proferens of that term: Reasons, paragraph 27.

33. For the foregoing reasons, Owners seek that the Award be varied so as to allow their claim to profit-sharing; alternatively that the Award be set aside and/or remitted.

CHARLES PRIDAY.

Counsel for the Owners

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION


BETWEEN:-


GOLDEN PRESIDENT SHIPPING CORPORATION
Applicant (Claimant
Owners)


- and -


BOCIMAR NV

Defendant (Respondent
Charterers)


"CHANNEL ALLIANCE"


I, Timothy James Houghton of St Olave's House, Ironmonger Lane, London EC2V 8EY state
as follows:

1. I am a solicitor and Partner in the firm of Winter Scott of the above address. I have
   the conduct of this matter on behalf of the Claimant ("Owners"). I make this
   statement in support of Owners' application for permission to appeal pursuant to
   section 69 of the Arbitration Act 1996 against the Final Arbitration Award dated 15th
   August 2007 of Messrs Timothy Rayment, William Robertson and Mark Hamsher
   ("the Award"), whereby the arbitrators dismissed the Owners' claim under a
   Charterparty dated 23/6/1999 ("the Charterparty").

2. I attach to this statement a copy of the Charterparty and of the Award, in a paginated bundle marked "TI.1".

3. The Grounds upon which this application are made, and the errors of law which Owners have identified in the Award, are fully set out in the Grounds of Application annexed to the Arbitration Claim Form.

4. For the reasons set out in those Grounds, which I adopt for the purposes of this statement:

   a. The following issues of law arise out of the Award:

      i. Whether upon the true construction of clause 98 of the Charterparty dated 23rd June 1999, optional years (if any) were to be considered for profit-sharing purposes, so that the profits in those years had to be shared between Owners and Charterers

      ii. whether it is correct as a matter of law in an issue of construction of a Charterparty term

         1. to consider first the literal meaning of the term before giving any consideration to the commercial context of the transaction

         2. to have regard to the (apparent or perceived) relationship between the rate of hire and

            a. the financing and running costs of the vessel

            b. market rates

         and to use these considerations as an aid to construction

         3. to have regard to whether the transaction as a whole is perceived to be *"beneficial"* or *"advantageous"* or *"profitable"* to one party or the other, so as to use that perception to influence the interpretation of a term.

   b. The decision of the tribunal on these issues, which are all part of the question which the tribunal was asked to determine, was obviously wrong and/or the

21

foregoing issues raised matters of general importance and the decision of the
Tribunal is at least open to serious doubt.

c.  The determination of these questions will substantially affect the rights of the
parties.

d.  It is just and proper for the Court to determine these issues of law, despite the
agreement of the parties to resolve the matter by arbitration.

5.  I therefore respectfully seek an order for permission to appeal against the Award.

I believe that the contents of this statement are true.

Signed: _____

Timothy James Houghton

Dated:    31st August 2007

<u>IN THE HIGH COURT OF JUSTICE</u>

<u>QUEEN'S BENCH DIVISION</u>

<u>COMMERCIAL COURT</u>

<u>THE MATTER OF THE ARBITRATION ACT 1996</u>

<u>AND</u>

<u>IN THE MATTER OF AN ARBITRATION</u>


B E T W E E N :-


### GOLDEN PRESIDENT SHIPPING CORPORATION
Applicant (Claimant Owners)


- and -


### BOCIMAR NV

**Defendant** (Respondent Charterers)


### "CHANNEL ALLIANCE"

This is the exhibit marked TH1 as referred to in the witness statement of Timothy James Houghton dated 31st August 2007.

23

# Time Charter

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913 — Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

Clauses 29 to 68 as attached hereto are deemed to be fully incorporated in this Charterparty.

The original Charter Party is our possession.

Owners

Signed on behalf of Sinochem Maritime Corporation Ltd.
of Monrovia, Liberia, as agents only

Charterers

For and on behalf of
Charterers of —— Monrovia
as Agents only

RIDER CLAUSES TO M.V. "CHANNEL ALLIANCE"
CHARTER-PARTY DATED 23ʳᵈ JUNE 1999

29. VESSEL DESCRIPTION INCLUDING SPEED AND CONSUMPTION

Type                          :   Bulk Carrier
Flag                          :   Philippines
Port of Registry              :   Manila
Built                         : . 29 October 1995
                                  NKK Corporation, Tsu Works
                                  Hull No. 178
Registry No.                  :   MNLA 000332
Class                         :   LR
                                  +100A1 Bulk Carrier strengthened for
                                  heavy cargoes, Hold Nos. 2, 4, 6 and 8
                                  may be empty, +LMC and UMS.
Class No.                     :   9127461
Call sign,                    : . DYGI
Inmarsat        Phone         :   354803910
                Fax           :   354803911
                Tlx           :   354803912

Dimensions                    :   LOA     289.0 m
                                  LBP     279.0 m
                                  BMLD    45.0 m
                                  DMLD    24.1 m

Summer DWT/Draft              :   171,978 mt/17.730 m
Tropical DWT/Draft            :   176,382 mt/18.099 m
Winter DWT/Draft              :   167,576 mt/17.361 m

GRT/NRT                       :   87,368/57,232
Suez Gross/Net                :   89,463.63/83.873,53
Light displacement            :   20,850 mt
TPC                           :   119 mt

Main Engine/MCO/NSO           :   Mitsui Man B&W 6S70MC (MK5)
                                  MCO 20,000 PS x 80,0 RPM
                                  NSO 17,000 PS x 75.8 RPM

- [ -

3

26

Grain Capacity per hold (inc hatch) :    No. 1 - 18,126  cum
                                   2 - 21,954   "
                                   3 - 22,215   "
                                   4 - 22,193   "
                                   5 - 22,117   "
                                   6 - 21,924   "
                                   7 - 22,043   "
                                   8 - 21,754   "
                                   9 - 19,256   "
                               Total  191,582  cum

Dimensions of hatches         :    No. 1 -  15.20 m x 18.80 m
                                  No. 2-8 - 15.20 m x 20.60 m
                                  No. 9 -  15.20 m x 17.50 m

Hatch cover type           :    Tsuji - side rolling (hydraulically operated)

Tank capacities    Fuel oil    :    4,174  cum
                 Diesel oil  :     360  cum
                 Fresh water :     512  cum
                 Ballast water :  77,219  cum
                 (inc. No. 6 cargo hold and peak tanks)

Vessel is self trimming single deck Bulk Carrier, no deeptanks, gearless, engine/bridge aft.

Owners warrant that vessel has sufficient stability and safe trim when homogeneously loaded to full cubic and dead-weight capacity.

Vessel is equipped with a gyro compass, radio direction finder, radar and both medium and VHF radio telephone all in good order.

Vessel is steel floored and no obstruction in holds.

Vessel is approved for grain loading under rules of the 1974 Solas and any amendments thereto and has dispensation from trimming hold ends.

All details 'about'

Bunker specification clause :
All grades to be acid free
All grades to be derived from petroleum crude oil.
No coal derived products allowed.
Products must be homogeneous
Must exclude waste oils and luboils
Must exclude residues from acid slops and sludges
Must exclude any other chemicals or substances which can damage marine engines, marine boilers and associated equipment.
IFO 380 CST = RMG 35 ( RMH not acceptable)
MDO - dist. diesel = DMB (DMC not acceptable)
Minimum /maximum limits as per ISO 8217, 1st revision DIS 1994 standards.

- 2 -

Speed and Daily Bunkers Consumption (about and in metric tons per day) warranted by Owners :
Throughout the whole period of the Charter Party, Owners warrant the following speeds and daily consumption (about) under good weather conditions up to but not including Beaufort Scale 4 and/or Douglas Sea State 4.

A) At Sea : (including marine engines, marine boilers and associated equipment) :

|  | H.F.O. consumption (about) | |
| --- | --- | --- |
| Vessel's speed | H.F.O. fully laden On summer draft | H.F.O. In ballast |
| About 13.0 knots | 51.0 mt | 38.5 mt |
| About 13.5 knots | 53.0 mt | 39.0 mt |
| About 14.2 knots | 55.0 mt | 40.0 mt |

B) Daily Bunkers Consumption (about) in Port and at Anchorage : (including marine engines, marine boilers and associated equipment) : abt DO 4 mt per day

Above speeds/consumptions are about and valid up to but not including Beaufort Force 4 (four) and/or Douglas Sea State 4. If speed/consumption is worse, whether as measured by speed at given consumption or consumption at given speed, then Charterers can claim against Owners all time or bunkers used in excess of warranted figures. Weather reports to be taken from the vessel's deck log and from independent company/Government weather reports, the latter to apply in case of major descrepancies.

Vessel may burn Diesel Oil in low load, i.e. when stopping, starting, manoeuvring in confined waters, leaving and entering port etc. Consumption in port abt 4 mt D.O. per day.

30.  CARGO

Charterers shall have the right to load only harmless coal, iron ore, including iron ore concentrates and iron ore pellets, manganese ore, always excluding DRI/DRIP and sponge iron.

Cargoes to be always loaded/discharged in accordance with latest I.M.O. recommendation.

. 3 .

## 31. REDELIVERY

### Delivery
Owners shall give charterers 45/30/15/10/7/5/3/2 and 1 day approximate notice of delivery and probable port (or ports within a specified range), immediately advising Owners of any change in intended delivery port.

### Redelivery:
Charterers shall give Owners 45/30/15/10/7/3/1 days approximate notice of redelivery date and probable port (or ports within a specified range), immediately advising Owners of any change in intended redelivery port.

Owners respectively Charterers not to change the specified delivery respectively redelivery range once the 45 days redelivery notice has been given.

## 32. OWNERS' EXPENSE

Owners shall provide and pay all expenses arising due to the Vessel's flag or nationality of the Owners, Officers or crew, including immigration fees and all consular fees. Owners shall also provide and pay for garbage removal and lubricating oils.
See Clause 1.

## 33. FUMIGATION

Fumigation, if any, shall be for Owners' account and the time required therefore shall be off-hire, unless fumigation is attributable solely to cargo carried or ports visited under this charter. Fumigation arising from Charterers' responsibility shall be for Charterers' account and time required therefore shall not be off-hire.
See also clause 1.

## 34. HOLD CLEANING

Charterers shall have the right to redeliver the Vessel with cargo compartments as left by Stevedores and Charterers shall pay US Dollars 5,000.00 lumpsum in lieu of cleaning.

Hold cleaning equipment, mutually agreed, between Owners and Charterers to be installed prior to delivery with cost being shared equally between both parties.

- 4 -

29

Upon completion of discharging each cargo under this charter, the Vessel's crew shall clean all cargo compartments in preparation for the next cargo if required by Charterers. This cleaning shall be performed whilst the Vessel is en route from her last discharge port to her next loading port, provided the duration of such voyage is sufficient and weather permitting. Cleaning shall be carried out as efficiently as if the Vessel were trading for the Owners' account, but Owners not to be responsible for the result and passing surveys. Charterers paying US$ 200 per hold cleaned for sweeping only but Charterers agree to pay US$ 450 per hold and fresh water used for washing holds.

35. PERIOD

Five (5) years two (2) months more or less in Charterer's option timecharter.

Charterer's option declarable latest at the end of the 54th month for an additional 6th year timecharter.

Charterer's option declarable latest at the end of the 66th month for an additional 7th year timecharter.

The 2 months more or less in Charterer's option to apply only on the final period

36. DELIVERY/REDELIVERY

Vessel to be delivered respectively redelivered dropping outwards last seapilot one safe port UK-Continent Skaw/Passero range or in Owner's respectively Charterer's option dropping outward last seapilot Singapore/Japan range including China,Taiwan,Philipines,Indonesia and Malaysia or in Owner's respectively Charterer's option dropping outwards last seapilot one safe port USEC, USG, Brazil or in Owner's respectively Charterer's option passing Muscat outbound any time day or night Sundays or Holidays included.

37. TRADING EXCLUSIONS

Iran, Iraq, Cyprus, Turkish occupied Cyprus, Red Sea, Gulf of Aqaba, Amazon River, Kampuchea, Angola(including Cabinda),Lebanon, Syria, Lybia, Cambodia, Vietnam, North Korea, Nigeria, Albania, Cuba, Orinoco River, Iran, Iraq, Kuwait, Russian Pacific ports, Somalia, Serbia, Montenegro including Kosovo,Algeria, War and Warlike zones as may be excuded by the vessel's Underwriters or any country under United Nations sanctions.

Charterer's option to trade St. Lawrence once per winter season with Owner's prior permission which not to be unreasonably withheld.

38. BUNKERS ON DELIVERY/REDELIVERY

Charterers at time of delivery shall take over and pay for all bunkers remaining on board the vessel at the price as quoted by Platt's at the time and the place or the nearest place of delivery. Vessel will be delivered with about 300 mt IFO and about 60/70 mt MDO but always sufficient to reach nearest main bunkering port.

Owners at time of redelivery shall take over and pay for all bunkers remaining on board the vessel at the price as quoted by Platt's at the time and the place or the nearest place of redelivery. Vessel will be redelivered with about 750 mt IFO and about 60/70 mt MDO but always sufficient to reach nearest main bunkering port.

39. Charterers prior to delivery under this Charter to have the privilege to replenish bunkers, always provided that such bunkering does not interfere with discharging operations.

Owners prior to redelivery under this Charter to have the privilege to replenish bunkers, always provided that such bunkering does not interfere with discharging operations.

40. JOINT SURVEYS

A joint on-hire survey for the purpose of determining the Vessel's condition, equipment, quantities of bunkers, fresh water, etc., shall be held at the port of delivery. The expenses shall be shared equally between Owners and Charterers. On-hire survey in Owner's time.

A joint off-hire survey for the purpose of determining the Vessel's condition, equipment, quantities of bunkers, fresh water etc., shall be held at the port of redelivery. The expenses shall be shared equally between Owners and Charterers. Off-hire survey in Charterers' time.

41. WITHHOLDINGS

The estimated value or expected quantities of bunkers R.O.B. on redelivery shall be deducted from the last hire payment and/or from preceding payments if the final hire payment is likely to be insufficient to cover the Charterers' estimated entitlement.

Charterers also have the liberty to withhold from the last hire payments:
(1)   Bonafide and reasonably assessed claims for vessel's off-hire or underperformance
(2) Actual or estimated Owner's disbursements
(3) Domestic bunker consumption during the currency of this charter
(4) Any advances made to Owners and/or to vessel's master
(5) Payment of any fines and other amounts which may reasonably be held to be for Owner's account.

- 6 -

31

42. BANKING DELAYS

    a.    Evidence of receipt by Owners' bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5.

    b.    Failing payment of full hire, less any specifically agreed amount, the Owners will have the right to withdraw the vessel without prejudice to any claim the Owners may have against the Charterers under this charter-party.

    c.    Where there is any failure to make 'punctual and regular payment' due to oversight, negligence or error or omission of Charterers or their agents, employees or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be granted three (3) banking days grace to rectify the failure, after which delay, should conditions of paragraph A above be not satisfied, provision of paragraph B above would apply.

43. BREAKDOWN, ACCIDENT AND DRYDOCKING

Should the vessel put back whilst on voyage by reason of an accident or breakdown, or in case of drydocking pursuant to Clause 80, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person on board the vessel other than Charterers' super cargo and/or other persons travelling by request of the Charterers) the hire shall be suspended from the time of the inefficiency until the Vessel is efficient in the same or equivalent position and the voyage resumed therefrom. All extra expenses incurred, including bunkers consumed during period of suspended hire, shall be for Owners' account.

44. SEIZURE/ARREST/REQUISITION/DETENTION

Should the vessel be seized, arrested, requisitioned or detained during the currency of this Charter Party by any authority or at the suit of any person having or purporting to have a claim against or any interest in the vessel, the Charterers' liability to pay hire shall cease immediately from the time of her seizure, arrest, requisition or detention and all time so lost shall be treated as off-hire until the time of her release. Any extra expenses incurred by and/or during above seizure, arrest, requisition or detention are to be for Owners' account.

45. INSURANCE PREMIUM BENEFIT

Charterers shall have the benefit of return insurance premium, if any, receivable by Owners from the underwriters by reason of the vessel being in port for a minimum of thirty (30) consecutive days. The Charterers shall be entitled to such benefit for all time on-hire during the period for which insurance premium is refundable.

-7-

## 46. STEVEDORE DAMAGE

Charterers shall not be responsible for stevedore damage to the Vessel unless such damage is reported by the Master to the Charterers or their Agents, in writing, within 24 hours of occurrence of the damage. If practicable the Master and/or Owners shall in the first instance use their best endeavours to recover the costs of repairs from stevedores and, if unsuccessful, shall obtain written acknowledgement from the party responsible for the cause of damage. However, in the case of damage occurring at a loading port which is hidden at the time of occurrence, Master notice may be delayed upto completion of discharge at final discharge port of the voyage. The Master shall arrange for a survey to define and/or estimate the damage in agreement with the Charterers' Agents and/or supercargo, unless the damage has been repaired in the meantime. The Master shall co-operate with Charterers and Agents in establishing and giving prompt written notice of claim to the party responsible for the cause of the damage.

Damages affecting vessel's class or seaworthiness to be repaired by Charterers at their time and expense immediately at the port of occurrence prior to sailing, provided such damages are Charterers liability under the terms of this clause and Owners have not obtained relief from stevedores.

## 47. GRAB DISCHARGE

The Vessel shall be suitable for grab discharge and no cargo shall be loaded in places inaccessible to grabs. Charterers shall have the privilege of using bulldozers in vessel's holds and to use mobile cranes on deck or hatch coamings provided the crane weight does not exceed the unit loading of the vessel's deck or hatch coamings, as applicable.

## 48. CREW/STRIKE/BOYCOTT

In the event of the vessel being boycotted by I.T.F. delayed or rendered inoperative by strikes, labour stoppage or by any other difficulties due to vessel flag, ownership, crew, terms of employment of Officers and crew or any other vessel under the same ownership operation or control, all time lost is to be considered as off-hire and expenses incurred thereby to be for Owners' account.

## 49. I.T.F.

Owners guarantee the vessel Officers and crew are employed through this Charter under terms and conditions acceptable to the I.T.F. or equivalent. The vessel is Australian hold ladders fitted, fully equipped and in all respect suitable for trading via Australia.

- 8 -

19

33

## 50. BILLS OF LADING

If required by Charterers and/or their agents, the Master shall authorise them to sign Bills of Lading, using Charterers' form, on his behalf in accordance with the mate's and/or tally clerk's receipts without prejudice to this Charter Party, in which case Charterers shall fully indemnify and hold the vessel and Owners harmless and free from all responsibilities or consequences therefrom.

In the event that the covering original Bills of Lading are not available at the destination when the vessel is ready to discharge, Owners, at the request of Charterers, agree to release the cargo without presentation of the original Bills of Lading provided that, prior to delivery of cargo, Charterers have submitted to the Owners, a letter (as Attachment No. 1) agreeing to fully indemnify and hold Owners and/or the vessel and/or the Master and/or agents harmless against any consequences resulting from the vessel releasing cargo without presentation of the original Bill of Lading and also to remain fully responsible for all damages and/or consequences that may arise out of the release of the cargo as above stated.

No bankguarantee will be required.

## 51. SUEZ CANAL

Subject to vessel of this size being permitted by the Canal Authorities to transit the Suez Canal, Owners undertake that throughout the period of service under this Charter Party, they shall comply with the regulations in force so as to enable the vessel to pass through the Canal by day and by night without delay up to maximum canal drafts without the assistance of tugs, unless required by Suez Canal Authorities.    Tug assistance necessary due to vessel's proven deficiency/inefficiency shall be for Owners' account.

## 52. COMMUNICATION

The Master, senior Officers and the radio Officer shall be fully conversant in the English Language.

## 53. SMUGGLING

Any delay, expenses and/or time incurred on account of smuggling shall be for Owners' account, unless proven by Charterers and/or persons appointed by Charterers.

- 9 -

34

54. DUNKIRK SUITABILITY

Owners confirm that the vessel is capable of discharging at Dunkirk whilst meeting the criteria:

Draft: 14.2 metres
Airdraft: 18.7 metres (Waterline to top of hatch cover)
Ratio DWT/ME hp < 10
ME power forward = ME power astern
Beam maximum 45 meter (hull + plate)
Bridge wings not to exceed ship's beam

55. CERTIFICATES

The Owners warrant that the vessel shall throughout the currency of the Charter Party be in possession of valid classification and trading certificates. See Clause 51.

56. COMPLIANCE WITH U.S. SAFETY AND HEALTH REGULATIONS

If the vessel calls at any U.S. port for the purpose of loading or discharging cargo, the vessel's equipment shall comply with regulations established under U.S. Public Law 85-742 part 9 (Safety and Health Regulations for Long-Shoring) or any subsequent amendments. If long-shoremen are not permitted to work due to the failure of the Master and/or Owners to comply with the aforementioned regulations, any delay to the vessel resulting therefrom shall be for Owners' account.

57. WAR RISK INSURANCE

Basic annual war risk insurance on Hull/Machinery for worldwide trading in such amounts as Owners shall deem sufficient shall be for Owner's account.

Any increase in premium incurred by Owners, charged by underwriters due to breach of vessels existing basic annual war risk insurance policy, shall be borne by Charterers.

Additionally, Charterers to reimburse Owners for extra crew expenses and crew bonus, if any.

58. OFF-HIRE EXTENSION

Charterers have the option to add off-hire period, if any, and option to be declared 30 days before redelivery.

- 10 -

12

59. BENEFIT OF OWNERS P AND I CLUB

Charterers shall have the benefit of Owners Protection and Indemnity Association as far as the Club rules permit.
See also Clause 77.

60. LAY-UP

The Charterers shall have the right to order the laying-up of the vessel at any time and for any period of time at a safe berth/anchorage where approved by Owners' hull/machinery underwriters and classification society and in the event of such lay-up, the Owners shall promptly take steps to effect all the economies in operating cost including insurance which may be possible and give prompt credit to the Charterers in respect such economies. At the request of the Charterers, the Owners shall at any time provide an estimate of the economies which would be possible in the event of the laying-up of the vessel. Should the Charterers, having exercised the option granted hereunder, desire the vessel to again be put to service, Owners shall, upon receipt of written notice from Charterers to such effect, immediately take steps to restore the vessel to service promptly as possible. The option granted to Charterers hereunder may be exercised on or more times during the currency of this Charter-Party. Charterers to give Owners one month notice prior to laying-up vessel, and also one month notice to restoring vessel to trade.

Hire shall continue to be paid for the period of such lay-up but it is agreed that the aforementioned credit of economies to Charterers shall be effected by way of adjustment to hire. It is acknowledged that whilst Owners will effect the aforementioned economies and credit same to Charterers, Owners may incur expenses in deactivation and reactivation, the reasonable actual cost of which are to be reimbursed to Owners by Charterers. Should drydocking and painting be required as part of the reactivation process, the reasonable actual costs of same shall be reimbursed to Owners by Charterers and vessel shall remain on-hire. If such drydocking and painting coincides with or may with classification approval be applied to a scheduled drydocking, Charterers shall reimburse Owners for any extra drydocking/painting cost and time caused directly by vessel's lay-up in excess of cost and time of a scheduled drydocking that would otherwise have been incurred, Charterers and Owners will co-operate constructively in establishing all relevant savings and costs and will seek the assistance of independent surveyors if necessary.

61. FINANCIAL RESPONSIBILITY

Owners warrant that throughout the currency of this charter they will provide the vessel with following certificates : certificates issued pursuant to section 1015 (a) of the Oil Pollution Act 1990 and section 108(a) of the Comprehensive

- 13 -

13

Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with part 138 of Coast Guard Regulations 33 CFR.

## 52.  INSPECTION

Charterers shall have the option of inspecting the vessel superficially at their expense at any time by giving reasonable advance notice to the Owners. Owners and/or Master shall give every facility and assistance to carry out such inspection.

## 63.  TAXES

Any tax levied by any government other than the Owners' domicile or ship's flag in respect of the earning other than the hire to Owners of the vessel whilst under this Charter Party shall be for Charterers' account.

## 64.  HOUSE FLAG/CHARTERERS MARKINGS

Charterers shall have the privilege of flying their house flag and painting their markings on vessel's funnel, in which case Charterers shall restore markings before redelivery. Time and expense of such changes shall be for Charterers' account.

## 65.  VESSEL'S GEAR

Vessel shall work day and night, if required by Charterers. Any overtime charges for Officers and crew to be for Owners' account. If the vessel's gear for opening and closing hatches becomes inoperative, the vessel shall be off-hire. Such off-hire shall be calculated pro-rata to the number of inoperative hatches and shall count only if ship's loading or discharging is actually delayed.

## 66.  HATCHES

Crew shall open and close hatches before, during and after Stevedore work when and where required and when permitted by shore regulations, otherwise such operation is to be for Charterers' account.

- 12 -

57. FRESH WATER

Fresh water consumed under this Charter-Party by Stevedores and/or for the purpose for Charterers' business in excess of vessel's fresh water generating capacity shall be for Charterers' account.

68. DEVIATION

Vessel shall have the liberty to deviate for the purpose of saving life and/or property and to tow and assist vessels in distress, such operation shall not be deemed to be a deviation under Charter Party, but all salvage attribution thus payable to the vessel shall be equally divided between Charterers and Owners after proper deduction of expenses, if any (including Master's, Officer's, crew's share) incurred in this respect.

69. BLACKLIST

Owners warrant that the vessel is not blacklisted by any country.

70. WATCHMEN

Watchmen shall be for Owners' account unless as compulsory required by port regulation or by Charterers and/or their agents for cargo.

71. OWNERS' AGENTS

Whilst on this Charter, Charterers agree that Owners shall be able to use Charterers' agents for usual Owners' matters, such as crew's medical treatment, store pass, dispatching and/or delivery mail and/or telegrams, ordering small repairs and/or purchasing ships supplies, provided said agents are willing and able to do so and with Owners paying the actual costs for such matters without paying an additional agency fee. However, as to major Owners' matters, such as crew repatriation, hospitalisation, ship's accident and drydocking, etc., Owners shall appoint their own agents to attend to such matters and shall be responsible for funding the Agents accordingly. In case Owners are unable to arrange same, Charterers shall permit their agents to attend to such matters with Owners paying Charterers' agents the actual expenses involved and the agency fee according to the Agents' tariff rate (See also Clause 5).

72. CHARTERERS' EXPENSES PAID BY OWNERS

Charterers shall pay the Owners a lumpsum of US$ 1,000.- per month or pro-rata in consideration of vessel's communication costs on Charterers' business and the expenses of complimentary entertainment of port officials etc., disbursed by Owners.

- 13 -

73. POLLUTION PREVENTION

The vessel shall have on board a P and I Club pollution certificate.

74. OWNERS' BUNKER CONSUMPTION

Bunkers consumed during any period the vessel is off-hire for whatever cause shall be reimbursed by Owners at major suppliers price at next port of replenishment.

75. PRATIQUE

The vessel shall prepare radio pratique when instructed by the Charterers and shall be in possession of necessary certificates. Charterers' agents shall, as the vessel's trading pattern allows, properly direct the Master regarding the port authority's requirements prior to the vessel's arrival at each port of call, if any time/expenses incurred to be for Charterers' account.

76. VACCINATION CERTIFICATES

Owners shall be responsible for and arrange at their own expense for the Master, Officers and crew to be vaccinated and to be in possession of valid vaccination certificates throughout the period of this Charter. Any time lost/or additional expenses incurred due to failure to provide such certificates shall be for Owners' account.

77. P & I ASSOCIATION

Owners warrant that throughout the currency of this Charter Party the vessel shall be fully covered for insurance, including cargo claims, a leading Protection and Indemnity Association acceptable to Charterers, as provided by the rules of such Association. Such cover shall be at the sole expense of Owners.
If required by the Charterers, prior to commencement of the Charter or at any other time, the Owners shall procure that the Managers of the Protection and Indemnity Association shall confirm to the Charterers in writing that the vessel is fully covered by the Owners and that all calls have been paid up to date.

If Owners fail to maintain P & I cover as provided for in this Clause in the manner described, the Charterers may place equivalent insurance at Owners' expense and deduct the cost of such insurance from the vessel's hire.

See also Clause 59.

- 16 -

78. BILLS OF LADING CLAUSES

The New Jason Clause (Clause 83), New Both to Blame Collision Clause (Clause 84), the CONWARTIME 1993 (Clause 85) shall be incorporated in this Charter Party and the Clause Paramount (Clause 79) and P & I Bunkering Clause shall be contained in all Bills of Lading issued hereunder.

79. CLAUSE PARAMOUNT

The Hague Visby Rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading, dated Brussels, 23rd February, 1968, as enacted in the country of shipment shall apply to this Contract. When no such enactment is in force in the country of shipment the corresponding legislation of the country of destination shall apply. In respect of shipments to which no such enactments are compulsory applicable the terms of the said Convention shall apply.

80. DRYDOCKING

Owners' privilege to drydock and/or repair the vessel at any time during the currency of this charter for any purposes upon their giving Charterers sixty (60) days notice, together with estimated period required, but the vessel to be drydocked at least twice every five years or as required by vessel's classification.

In cases of unforseen emergencies occurring, no such notice needs to be given to Charterers, but if required by Charterers, Owners to provide Charterers promptly with all required documentary evidence pertaining to the emergency occurrence, including but not limited to classification society or their agents' reports, certificates, correspondence, repair yard documentation and/or invoices.

Vessel to be placed off-hire from the time the vessel puts back to a port or departs from or interrupts the voyage or is withdrawn from the service of Charterers for drydocking, repairs or other Owners' purposes, until the vessel is again in the same position or at a point equivalent thereto.

81. WAR ZONE

The vessel, unless the consent of Owners be first obtained, shall not be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, hostilities, war-like operations act of piracy or hostility. Owners shall notify Charterers promptly if any port to which Charterers have given notice the vessel is to be ordered is, in the opinion of Owners' hull underwriters, a war zone.

- 15 -

17

## 82.   PESTILENCE AND ILLNESS

Normal quarantine time and expenses to enter port shall be for Charterers' account. Any extra time or detention and/or expenses for quarantine due to pestilence and illness of the vessel's Master, Officers and crew shall be for Owners' account but if quarantine detention is due to the vessel having been sent by Charterers to an infected port, such detention time and expenses shall be for Charterers' account.

## 83.   GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules 1974 as amended but where the adjustment is made in accordance with laws and practice of the United States of America, the following clause shall apply :

NEW JASON CLAUSE
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, to be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery".

Charterers shall ensure that the Bills of Lading issued under this Time Charter Agreement shall contain or incorporated by reference this 'General Average and New Jason Clause".

## 84.   BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter fails to be determined in accordance with the laws of the United States of America the following clause shall apply :

NEW BOTH TO BLAME COLLISION CLAUSE

"If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying ship or her owners of said goods, paid or payable by the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or object are at fault in respect to a collision or contact." and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the above Clause.

85. CONWARTIME 1993

(1) For the purpose of this Clause, the words :

(a) "Owners" shall include the shipowners, bareboat charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master ; and

(b) "War Risks" shall include any war ( whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines whether actual or reported ), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone ( whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or

- 17 -

42

19

is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interest (including, but not limited to, loss of earnings and detention the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty :

(a) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions ;

(b) To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance ;

(c) To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement.

(d) To divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier ;

- 18 -

20

(6) To divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter-Party.

86. **TITLES**

The titles to clauses and sub-clauses of this Charter-Party shall not in any way affect the interpretation thereof.

87. **LAW**

This agreement shall be construed in accordance with English law.

88. **CARGO CLAIMS**
"Cargo claims shall be settled in accordance with the Inter Club New-York Produce Exchange agreement of February 1970 as amended May 1984 and any subsequent amendments.

89. **TIME**

Delivery and redelivery time to be based on G.M.T.

- 19 -

21

90. MANOEUVRING IN SHALLOW/NARROW WATERS

The vessel to have the liberty of using diesel oil when entering and leaving ports and for manoeuvring in shallow/narrow waters.

91. SEAWORTHY TRIM

The vessel to be left in seaworthy trim to Master specification for shifting between loading berths/ports and between discharging berths/ports.

92. CHANGE OF FLAG

The Owners may change the vessel's ownership and flag for internal use within their group to another flag subject to Charterers' approval but such approval not to be withheld unreasonably.

93. NOT TO FORCE ICE

The vessel not obliged to force ice nor to follow ice breakers when inward bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the vessel being frozen in and/or damaged, she has the liberty to sail to a convenient open place and await the Charterers' fresh instructions, detention through any of the above Clause to be for Charterers' account.

94. DOUBLE BANKING

The charterers may have the privilege to Double Bank the vessel i.e. may order the vessel alongside any other vessel and vice versa. However, all additional cost/arrangements (including mooring Master to arrange fenders to be put between vessels) time responsibility arising from the double bank operation to be for Charterers' account and Charterers to provide other vessel's Masters prior written approval. In any case, same always to be in accordance with Master's approval and satisfaction.

95. ISRAEL

Vessel's mooring plan equipment is suitable and acceptable by N.C.S.C. to berth/stay alongside Hadera Coal Terminal.

- 23 -

22

45

## 96.  MOBILE CRANE CLAUSE

Provided deck strength is sufficient and deck arrangements permit, Charterers
have the option to discharge the vessel by mobile cranes placed on deck, but
always at their risk and expense. Charterers to take extra insurance cover, at their
expense, to cover whole operation including any loss, damage to cargo or vessel
due to unusual bulk load/discharge. Any damage caused by mobile cranes to be
made good to Master's satisfaction and classification society survey as
recommended in Charterer's time and at Charterer's expenses.
In case of shifting between berths and/or ports with charterer's equipment on
board, lashing/securing/dunnaging always to be done to Master's satisfaction
and in Charterer's time,risk and expense.

## 97.  SEA WAYBILLS

Charterers to have the option to use Sea Waybills instead of Bills of Lading. In
such cases following will apply : 'All references to Bill(s) of Lading in this
Charter-Party are to be replaced by the words Sea Waybills'.
Charterer's Sea Waybill form is to be based on the "General Sea Waybill" issued
by BIMCO (code name :"Genwaybill"). Subject to the terms of the revelant Sea
Waybill the entire cargo is to be delivered to the consignee mentioned in the
relevant Sea Waybills and presentation of Sea Waybills shall not be required
prior to commencement of discharge'

## 98.  PROFITSHARING

Charterers and Owners agree that over the basic charter period of 5 years both
Owners and Charterers will share the profit made on a 50/50 basis on the
running of the vessel as compared to the floor rate of charter hire i..e.USD
13,750/day. The profit made will be calculated by comparing the floor rate of
USD13,750/day with the average rate reflected in the Baltic Capesize Index
(daily average of the routes 8-9-10-11 as published by the Baltic Capesize Index
to be adjusted upwards by usd 975 per day  or prorata to reflect the value of the
MS Channel Alliance compared with the 'index' vessel) during any year of the
basic charter period.

Should during the currency of the Charter the Baltic Cape Size Index cease to
exist as a means of comparison or should the parameters of the Index which
existed at the time of conclusion of the Charter be amended, parties will agree a
new reference rate. If parties cannot agree on such reference rate, in order to
determine same parties will appoint a reputable London broker by mutual
consent, or, if parties cannot agree on such broker each party will appoint their
own broker who will both appoint a third broker should the two appointed fail to
agree.The decision of the appointed broker or brokers will be binding.

- 21 -

23

At time of fixing the Baltic Capesize Index (B.C.I.) is described as follows :

③

"Timecharter routes : based on a Baltic Capesize of the following specification : 161.000 mt dwt, not over 10 years of age, 176.000 cbm grain, max. loa 280 m.max. beam 45 m, 14 knots laden, 14,5 knots ballast on 52 mts fuel oil, no diesel at sea.
– Route 8 : Delivery Gibraltar-Hamburg range, 5-15 days ahead of the index date, trans Atlantic round voyage duration 30-45 days, redelivery Gibraltar-Hamburg range, 3.75 per cent total commission
– Route 9 : Delivery ARA or passing Passero, 5-15 days ahead of the index date, redelivery China-Japan range, duration about 65 days, 3.75 per cent total commission
– Route 10 : Delivery China-Japan range, 5-15 days ahead of the index date round voyage 30-40 days, redelivery China-Japan range, 3.75 per cent total commission
– Route 11 : Delivery China-Japan range, 5-15 days ahead of the index date, redelivery ARA or passing Passero, duration about 65 days, 3.75 per cent total commission"

④

At the end of each year of the basic charter period the profit or loss for that year will be assessed by comparing the average Baltic Capesize Index rate for that year (adjusted accordingly) with the basic charter rate over the number of days that the vessel has been in service excluding days of off-hire.

⑤

If a profit has been made in any particular year an advance in respect of Owners' share will be made by Charterers to Owners at the end of that year provided however that if losses have been made in the previous year(s) which are greater than the profit made no advance will be made. If during the currency of any year Charterers anticipate that there will be an overall loss taking into account the previous year(s) Charterers will be entitled to make deductions from hire to up to the total amount of profit already advanced to Owners during the preceding years to cover such loss.

⑥

For profit sharing purposes, optional year(s), if declared to be considered on their own,

⑦

Example profit sharing
– year 1 : loss USD 300.000
no distribution/no reduction
– year 2 : profit USD 100.000 –
no distribution/no reduction
– year 3 : profit USD 400.000 –
distribution of USD 100.000 to GO
(i.e. 50 % of USD 400.000 – (USD 300.000-USD 100.000))
– year 4 : profit USD 500.000
distribution of USD 250.000 to GO
– year 5 : loss USD 400.000
Charterers can deduct USD200.000 from the hire (upto maximum the advances)

- 22 -